In re Kenneth GEORGE.

In re EPIC Holdings, Inc., EPIC Health-care Group, Inc., and EPIC Health-care Management Co.

Nos. 99–0616, 99–0648.

Supreme Court of Texas.

Argued Feb. 9, 2000.

Decided July 6, 2000.

**512**

Lawrence J. Fossi, Stephanie K. Crain, Vinson & Elkins, Houston, Scott L. Cole, Brian E. Robison, William D. Sims, Jr., Vinson & Elkins, Dallas, Mike McKool, McKool, Smith, Dallas, James E, Pennington, Dallas, Marie R. Yeates, Vinson & Elkins, Houston, for relator.

James J. Hartnett, Sr., The Hartnett Law Firm, Dallas, for respondent.

Chief Justice PHILLIPS delivered the opinion of the Court, in which Justice BAKER, Justice ABBOTT, Justice O'NEILL, and Justice CAYCE (Assigned)[1] joined.

In these consolidated mandamus proceedings, we decide whether attorneys can have access to the work product of their client's previous attorney when that attorney has been disqualified for representing the opposing party in a prior, substantially related matter. We hold that a successor's access to a disqualified attorney's work product should be restricted or denied to the extent that such a remedy furthers the purposes underlying the disqualification. Because we establish for the first time a standard for trial courts to follow when deciding this issue, we deny the petitions for mandamus without prejudice to afford Relators an opportunity to reurge their motions to the trial court in light of this opinion.

## I

This is the second mandamus proceeding arising out of this case. *See In re EPIC Holdings*, 985 S.W.2d 41 (Tex.1998) (*EPIC I*). In *EPIC I*, we disqualified the law firms of McKool Smith and Jordaan, Howard & Pennington ("McKool and Pennington") from representing plaintiff and real-party-in-interest Vicki Anderson in her lawsuit against HealthTrust, Inc.-The Hospital Company, Kenneth George and other directors of EPIC Holdings, Inc. ("EPIC"). We ordered disqualification because attorneys at those firms previously worked at Johnson & Gibbs, which represented Kenneth George and EPIC during EPIC's formation. We held that the firms violated Texas Disciplinary Rule of Professional Conduct 1.09 in two ways. First, their representation of Anderson was substantially related to their prior representation of EPIC because there was a genuine threat that confidential information obtained during the earlier representation would be disclosed in the course of their current representation. *See* Tex. Disciplinary R. Prof'l Conduct 1.09(a)(3) *reprinted in* Tex. Gov't Code, tit. 2, subtit. G app A (Vernon Supp.2000) (Tex. State Bar R. art. X § 9). Second, the firms questioned the validity of the work performed for EPIC by their former firm. *See* Tex. Disciplinary R. Prof'l Conduct 1.09(a)(1). We concluded that the principles embodied in Rule 1.09, including preserving confidences and maintaining the integrity of the bar, required disqualification. We delivered our decision in *EPIC I* on December 31, 1998.

On February 5, 1999, McKool and Pennington filed their notice of withdrawal. That same day, The Hartnett Law Firm ("Hartnett") entered an appearance on Anderson's behalf. Counsel for both EPIC and George immediately notified Hartnett of their position that new counsel should not receive, review or use any of

---

1. Hon. John Cayce, Chief Justice, Court of Appeals for the Second Court of Appeals District, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

McKool and Pennington's work product. They also instructed Hartnett not to view any documents from this case that are in the public record. When Hartnett advised that it did not agree, EPIC and George each filed Motions for an Order Prohibiting Turnover of Work Product and Related Material. During the hearing, an attorney with Hartnett revealed that he had already read portions of the public record. Without inspecting the work product in question, the trial court denied both motions. In its order, the trial court permitted McKool and Pennington to transfer Anderson's files to Hartnett, but prohibited the firms from communicating with each other about the case except to discuss the logistics of transferring the files.

Both EPIC and George sought writs of mandamus from the court of appeals. But the court denied all relief without reaching the merits of their claims, holding that EPIC and George had waived any rights by not timely moving to restrict Hartnett's access to the work product. EPIC and George then both filed petitions for mandamus in this Court. We granted the petitions on January 6, 2000, with JUSTICE ENOCH, JUSTICE HANKINSON, and JUSTICE GONZALES recusing themselves. 43 Tex. Sup.Ct. J. 236 (Jan. 6, 2000). The CHIEF JUSTICE certified the facts of the recusals to the Governor, who thereupon commissioned the Honorable Tom B. Ramey, Jr., Chief Justice of the Court of Appeals for the Twelfth District of Texas at Tyler, the Honorable John Cayce, Chief Justice of the Court of Appeals for the Second District of Texas at Fort Worth, and the Honorable Scott Brister, Judge of the 234th District Court of Texas, Harris County, to hear and decide the case. *See* Tex. Gov't Code § 22.005 (Vernon Supp.2000).

## II

Before reaching the merits, we first consider the court of appeals' holding that relators waived their rights, if any, to prohibit Hartnett from accessing the work product. As a rule, "[a] party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint." *Vaughan v. Walther,* 875 S.W.2d 690, 690 (Tex.1994) (per curiam). This rule applies equally to motions to restrict access to work product. Anderson argued, and the court of appeals agreed, that a timely motion must have been filed when Epic and George filed their motions to disqualify in 1995 and 1996. We disagree.

Although some courts have decided the disqualification and work product issues in the same proceeding, see *Quark, Inc. v. Power Up Software Corp.,* 812 F.Supp. 178 (D.Colo.1992); *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 416 A.2d 852 (1980), we are unwilling to hold that Relators' failure to bring both motions at the same time constitutes a waiver. Access to McKool and Pennington's work product only became a ripe issue once those firms were disqualified. Upon learning that Hartnett intended to seek access to the work product, Relators immediately moved to restrict access. On this record, we conclude that no waiver has occurred. *See First Wisconsin Mortgage Trust v. First Wisconsin Corp.,* 584 F.2d 201, 203 (7th Cir.1978) (en banc); *Wagner v. Lehman Bros. Kuhn Loeb, Inc.,* 683 F.Supp. 189, 190 (N.D.Ill.1987) (both considering the work product issue after disqualification had been decided previously).

## III

### A

Relators argue that by ordering McKool and Pennington to turn over all of their work product to Hartnett, the trial court in essence defeated this Court's disqualification order. The threat of disclosing confidential information led to disqualification in the first place, they reason, and it still exists because McKool and Pennington's work product contains confidential information they learned during the prior, sub-

stantially related representation. Furthermore, the work product gives Hartnett access to McKool and Pennington's theories for attacking their prior firm's work. Because the harm from McKool and Pennington's conduct would be perpetuated, the trial court's failure to restrict the transfer of work product constitutes an abuse of discretion.

Anderson responds that McKool and Pennington were not disqualified because of their work product. Neither the work product they created nor the confidential information they possessed caused this Court to order their removal, she says. Instead, the basis for disqualification arose only after McKool and Pennington challenged their prior firm's work during the trial. Any harm caused by this conduct was fully remedied by disqualification, and no further restrictions are necessary.

### B

When an attorney is disqualified, most successor counsel will want access to two different types of material. First, successor counsel will need the pleadings, discovery, correspondence, and all other documents contained in the public record or exchanged by the parties. While counsel could obtain these documents from the court's file or by discovery on the opposing party, it is much more convenient to assume control of the previous counsel's existing file. Second, successor counsel will want access to the work product created by the disqualified attorneys. "Work product" in this sense refers to all of the materials the attorneys created in anticipation of litigation or for trial that has not been placed in the public record or shared with the other side.

These two types of material are so different that they require separate rules. Pleadings, discovery, correspondence and other materials in the public record or exchanged by the parties are the essential documents necessary for successor counsel to understand the nature and subject matter of the case. Denying successor counsel convenient access to them burdens the abandoned client and the court without advancing any public policy. The disqualified attorney's work product, on the other hand, is more likely to contain confidential information. As a result, courts are much more concerned about turning over work product. *See, e.g., Reardon,* 416 A.2d at 862 (denying access to all undisclosed work product, but allowing access to material already disclosed); *see also* Note, *First Wisconsin Mortgage Trust v. First Wisconsin Corporation: The Work Product Order Subsequent to Attorney Disqualification,* 65 VA. L.REV. 973, 973 n. 3 (1979) [hereinafter *Attorney Disqualification*] ("Typically, litigants do not challenge turnover of materials that already have become part of the case."); John P. Gyorgy, Comment, *Access to Work Product of Disqualified Counsel,* 46 U. CHI. L.REV. 443, 458 (1979) [hereinafter *Work Product*] (challenge to turnover will involve prepatory work not pleadings and court papers).

■ Therefore, we hold that when an attorney is disqualified, successor counsel is presumptively entitled to obtain the pleadings, discovery, correspondence and all other materials in the public record or exchanged by the parties. *See Reardon,* 416 A.2d at 862. We recognize that the possibility exists that the disqualified attorneys could conceivably have revealed confidential information in discovery, correspondence, or other documents. If this has happened, the former client can protect against this disclosure by moving to seal such documents pursuant to Texas Rule of Civil Procedure 76a or by seeking a protective order under Texas Rule of Civil Procedure 192.6. In this case, Relators have not attempted to seal any documents. Indeed, they indicated in oral argument that they are no longer challenging Hartnett's use of disclosed materials. Thus, Hartnett, at the very least, may access and use the pleadings, discovery, correspondence and other public materials including the record from the mistrial.

## IV

### A

Access to work product, as we have said, is a much more serious matter. The purposes underlying the initial disqualification will often require a partial or total restriction on the successor counsel's access to the disqualified counsel's work product. *See First Wisconsin,* 584 F.2d at 208–09; *International Bus. Mach. Corp. v. Levin,* 579 F.2d 271, 283 (3 rd Cir.1978); *Behunin v. Dow Chem. Co.,* 642 F.Supp. 870, 872 (D.Colo.1986); *see also Work Product,* 46 U. CHI. L.REV. at 444; Note, *The Availability of the Work Product of a Disqualified Attorney: What Standard?,* 127 U. PA. L.REV. 1607, 1611 (1979) [hereinafter *What Standard?* ]; *Attorney Disqualification,* 65 VA. L.REV. at 982. Here, we hold that a restriction on work product is necessary to further the purposes behind this Court's disqualification order. Contrary to Anderson's assertions, we disqualified McKool and Pennington for at least two reasons. First, because Anderson's claims were substantially related to the prior representation, we believed there was a genuine threat that the lawyers would disclose confidential information learned in their prior representation. Disqualification was therefore necessary to protect Relators' confidential information. *See EPIC I,* 985 S.W.2d at 51–52. Second, we disqualified McKool and Pennington because, at trial, they impermissibly questioned the work of their prior firm. *Id.* at 52. We stated that "the legal system is ill-served by lawyers criticizing the work of their former associates" and "it is most unfair for a client to be forced to defend the work of the former associates of his opponent's counsel." *Id.*

Each of these grounds supports the further remedy of restricting Hartnett's access to McKool and Pennington's work product. If the work product contains confidential information, transferring the work product to Hartnett poses the same threat to Relators' confidential information as McKool and Pennington's presence in the case. Thus, a restriction on Hartnett's access to the work product is necessary to effectuate the purpose of disqualification. *See EZ Paintr Corp. v. Padco, Inc.,* 746 F.2d 1459, 1463 (Fed.Cir.1984); *Quark,* 812 F.Supp. at 180; *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* 616 F.Supp. 516, 521–22 (W.D.Mo.1985); *Reardon,* 416 A.2d at 862. Similarly, restricting Hartnett's access to McKool and Pennington's theories for attacking their prior firm's work is necessary to preserve the integrity of the legal system. Without access to the tainted work product, however, Hartnett can attack Johnson and Gibbs' work without violating any ethical rules and without appearing to do so.

### V

Having determined that a restriction on access is necessary, we now determine the extent of the restriction. This question necessarily involves determining whether the work product is actually tainted. In our analysis, we are informed by the analysis of other courts and writers that have considered this issue.

### A

Once they determine that a restriction is necessary because an attorney has been disqualified for a prior, substantially related representation, some courts do not inquire into the work product itself. They automatically forbid any work product from being transferred to the successor attorney. *See EZ Paintr Corp.,* 746 F.2d at 1463; *Quark,* 812 F.Supp. at 180; *Hallmark Cards,* 616 F.Supp. at 521; *cf. Reardon,* 416 A.2d at 862 (denying access to all undisclosed work product, but providing access to pleadings, discovery and correspondence). Although they may make exceptions for timing and the type of work, these courts, in effect, continue the irrebuttable presumption from the disqualification stage of the inquiry to conclusively presume that all the work product is tainted. The dissent would adopt this approach as this Court's standard. This ap-

proach may be appropriate for cases in which the entire suit is based on improperly revealed confidential information. *See Doe v. A Corp.*, 330 F.Supp. 1352 (S.D.N.Y.1971), *aff'd per curiam sub nom. Hall v. A Corp.*, 453 F.2d 1375 (2d Cir. 1972) (denying access to all material when plaintiff brought shareholder derivative suit based on confidential information learned while working for law firm that represented the defendant); *Slater v. Rimar*, 462 Pa. 138, 338 A.2d 584, 590–91 (1975) (denying access to all material when plaintiff brought suit based on confidential information learned from defendant's former counsel). But we believe that it is inappropriate for a general rule.

█ The attorney is the agent of the client, and the work product generated by the attorney in representing the client belongs to the client. *See Hebisen v. State*, 615 S.W.2d 866, 868 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ); TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15(d). Thus, a court should not deprive a client of his or her property without a compelling reason. *See Griffith v. Geffen & Jacobsen, P.C.*, 693 S.W.2d 724, 728 (Tex.App.-Dallas 1985, no writ) (allowing attorney to retain a client's papers as security for payment of the attorney's fee); TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15(d) and cmt. 9. While public policy prohibits a client from obtaining work product if it contains another's confidential information, an irrebuttable presumption that all of a disqualified attorney's work product is tainted is overly broad and unnecessary. *See Work Product*, 46 U. CHI. L.REV. at 465 (courts should not automatically suppress the entire work product of a disqualified attorney). Unlike the disqualification stage, where the only means for removing the threat of disclosure of confidential information by the attorney is to remove the attorney and his or her firm from the litigation, see *Henderson v. Floyd*, 891 S.W.2d 252, 253–54 (Tex.1995); *NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989), it is not necessary to

remove all the work product to protect against disclosure because it is unlikely that all of it is tainted. Work that is routine or work that is unrelated to the prior representation probably will not be tainted. *See Work Product*, 46 U. CHI. L.REV. at 464. Requiring successor counsel to reproduce this work does not further the purposes of disqualification, but does harm the client and delay the resolution of the case. *Id.* at 454 ("Denial of access to untainted work product does not, therefore, substantially further any of the purposes of the disqualification policy, although it does inflict substantial 'punishment' on the client of the disqualified attorney."). In many cases, therefore, the purposes behind disqualification can be fully effectuated without a blanket restriction.

### B

A second approach is to put the burden on the former client to show that the work product contains specific confidential information. In *First Wisconsin*, 584 F.2d at 209, the court concluded that the former client was in the best position to show how the turnover of work product would harm him or her. "Certainly the movant should be aware of the confidence or secrets which it imparted to the counsel which might reflect on the current litigation." *Id.*

This approach, we believe, does not sufficiently protect a client's confidential information. We believe that the former client should not have to point to confidences that might have been disclosed to the disqualified attorneys to preserve those confidences. *See Coker*, 765 S.W.2d at 400. During the disqualification stage, we go to some lengths to prevent the former client from being forced to reveal confidences. *Id.*; *Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831, 834 (Tex. 1994). Courts that have adopted the "substantial relationship test" do so to avoid actual inquiry into the specific confidences that may have been disclosed:

To compel the client to show, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule.

*T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 269 (S.D.N.Y. 1953). These same concerns cause us to reject the Seventh Circuit's approach at the work product stage. *See What Standard?,* 127 U. PA. L.REV. at 1626–27; Letitia Jane Grishaw, Comment, *Access to the Work Product of a Disqualified Attorney,* 1980 WIS. L.REV. 105, 127 (1980) [hereinafter *Access* ].

Furthermore, there are practical problems with requiring the former client to point to specific confidences. When a lengthy attorney-client relationship has existed, it will likely be difficult for the disqualifying party to remember what confidences have been disclosed. *See Access,* 1980 WIS. L.REV. at 127. The requirement is even more difficult for corporations, when several different people may have disclosed its confidences.

### C

A third approach courts use is a balancing test. *See Behunin,* 642 F.Supp. at 873 (citing *What Standard?,* 127 U. PA. L.REV. at 1611). Under this approach, the work product is not turned over if the possibility that confidences or secrets will be used against the former client outweighs the harm to the current client from being denied access. *See What Standard?,* 127 U. PA. L.REV. at 1611. To determine the "possibility that confidences will be used," the court does not require the former client to point to specific confidences. Instead, the court examines the similarity

between the two relationships to determine what type of confidences might have been revealed. The court then considers "the nature of the work product and the degree of attorney overlap to determine the magnitude of the possibility" that the work product contains confidences that will be used against the former client. *What Standard?,* 127 U. PA. L.REV. at 1630, 1623–30; *see also Behunin,* 642 F.Supp. at 873. The harm to the current client is determined by looking at the harm of duplicating the work and the fear that not all the work can be reproduced. *See What Standard?,* 127 U. PA. L.REV. at 1630. In *Behunin,* the trial court allowed turnover of all the work product because the former client could only establish a remote possibility that confidential information would be used against it and the harm to the current client would be great. 642 F.Supp. at 873.

We also find this resolution undesirable. *See Quark,* 812 F.Supp. at 180; *Work Product,* 46 U. CHI. L.REV. at 466; *Access,* 1980 WIS. L.REV. at 132–33. "The preservation of clients' secrets and confidences is not an option." *Coker,* 765 S.W.2d at 399. A balancing test would potentially allow a client's confidences to be sacrificed merely to alleviate another client's inconvenience. In questioning whether such a balance can properly be made, one commentator noted:

> An individual litigant's interest in obtaining access to the work product of disqualified counsel should never override the legal system's and all clients' interests in the preservation of confidences and the integrity of the attorney-client relationship.... The protection of confidences has been determined to be of paramount importance in the disqualification context and is no less important in the access to work product area. As a value, protection of confidences cannot be balanced against the interests of the individual litigant.

*Access,* 1980 WIS. L.REV. at 132–33.

### D

Thus, we are not entirely satisfied by the results reached in other jurisdictions.

An irrebuttable presumption harms the abandoned client more than necessary to further the purposes of disqualification. Requiring the client to point to specific confidential information, on the other hand, unduly undermines those purposes. And a balancing test could marginalize the importance of preserving confidential information. We, therefore, develop our own standard.

■ We begin with a rebuttable presumption that the work product contains confidential information. *See Work Product*, 46 U. CHI. L.REV. at 466. The presumption arises once the former client has established that the two representations are substantially related. The current client can rebut the presumption by demonstrating that there is not a substantial likelihood that the desired items of work product contain or reflect confidential information. *Id.* at 467; *cf. Phoenix*, 887 S.W.2d at 834 (nonlawyer who switches sides during litigation can rebut presumption that she has shared confidential information with her new firm).

A rebuttable presumption strikes a proper balance between the competing interests at stake. It protects the former client's confidences in two ways. First, it keeps the former client from having to disclose confidences in order to preserve them. *Coker*, 765 S.W.2d at 400. Second, it prevents a trial court from turning over any item of work product unless the current client proves that there is not a substantial likelihood that an item of work product contains or reflects confidential information. *See Work Product*, 46 U. CHI. L.REV. at 466. The ability to rebut the presumption of taint protects the current client's legitimate interest in its current counsel having access to whatever untainted work product has already been generated on its behalf, presumably at its expense. As a result, using the presumption ensures that the work product restriction will only go as far as necessary to further the purpose of disqualification.

Putting the burden to rebut the presumption on the party seeking access is appropriate. The current client is in the best position to offer evidence that shows that items of work product are not likely to contain or reflect confidential information. *See Work Product*, 46 U. CHI. L.REV. at 467. We recognize that the current client and successor counsel must rebut the presumption without reviewing the work product. For this reason, we do not require conclusive proof that confidential information is absent, but only a showing that it is substantially unlikely that an item of work product contains or reflects confidential information. *Id.* at 466. This is a high burden, as it should be to faithfully preserve the former client's confidences. But we think that the guidelines set forth below can provide the trial court with enough information to determine if the presumption has been rebutted.

■ Once successor counsel moves for access to the work product or the former client moves to restrict access, the trial court should order the disqualified attorneys to produce an inventory of work product. For each item of work product created, the inventory should describe the type of work, the subject matter of the item, the claims it relates to and any other factor the court considers relevant. *Id.* at 466; *What Standard?*, 127 U. PA. L.REV. at 1628–30. If an item of work product covers more than one claim or subject, the inventory should indicate this.

Generally, work product that is unrelated to the prior representation will not contain confidential information. For example, because Anderson's conspiracy claims are based on conduct occurring after the formation of EPIC, Hartnett and Anderson may be able to show that the work product related to these claims is not tainted by any information that the disqualified counsel learned when they represented EPIC. This may also be true of Anderson's prayer for a declaration about the effect of the assignment agreement she signed with HealthTrust.

Another consideration for the trial court is the nature of the work product. For example, deposition or case summaries are less likely to contain confidential information than a disqualified attorney's notes.

Finally, the subject matter of the work product is relevant. Legal research on certain procedural or evidentiary issues is unlikely to be tainted. These and other considerations that may be relevant in a particular case should guide the trial court in reaching its ultimate decision.

■ If the trial court cannot determine from the inventory whether an item of work product is tainted, it should then consider any other evidence presented by successor counsel. For questionable items, the trial court may also consider conducting an in camera inspection.[2] If the trial court is still unsure, then the presumption is not rebutted and the material cannot be turned over to successor counsel.

E

The concurring and dissenting justices argue that only an irrebuttable presumption for work product would be consistent with our other disqualification opinions. Because disqualifying a lawyer or a law firm is different than restricting access to work product, it requires a different rule. An irrebuttable presumption is necessary for lawyers because that is the only way to remove the threat of disclosure of confidential information. But a former client can never know which attorneys in the firm have learned which confidences. Unlike the contents of a lawyer's mind, work product is tangible and can be examined. Untainted work product can be separated from tainted work product. Thus, a complete ban on work product would provide more relief than necessary to protect

against the disclosure of confidential information.

The concurring and dissenting justices also point out potential problems with our approach, but they fail to offer a satisfactory alternative. Similar problems inhere in any procedure that eschews bright-line rules, such as assertions of privilege. While a bright-line rule is easy to administer, it fails to consider the current client's legitimate interest in obtaining the untainted work product produced on his or her behalf and the legal system's interest in avoiding delay and needless expense to litigants. Justice OWEN's "middle ground" approach consists of a bright-line rule and an unfair choice between the lesser of two evils. Under this approach, the current client would automatically lose all core work product, including those items unrelated to the prior representation. For other work product, the current client can either show the opposing party the work or recreate it. Either choice needlessly punishes the current client. Because neither the current client nor his or her current counsel have seen the disputed items, the former option cannot work without resort to disqualified counsel, who knows the secrets of both sides. This places disqualified counsel, who has already been removed for serving two masters, in a decision-making role that might give great advantage to one side or the other. On the other hand, foregoing all work product leads to the unnecessary expense that Justice OWEN deplores.

Our approach, although potentially complex, protects the former client's confidences while giving proper regard to the current client's need for untainted work product, all with minimal involvement from disqualified counsel. But the approach is not "porous" because the protection of confidences is paramount, reflected in a high

---

**2.** We are reluctant to require a trial court to inspect each item of work product in camera because the inventory list will, for many items, provide the trial court with enough information to make an informed decision.

Therefore, the trial court should only inspect those items for which the inventory list or other evidence does not provide a sufficient basis for decision.

burden of proof resting on the party which seeks the work product.

Furthermore, the concurring and dissenting justices overstate the severity of the potential problems. First, in preparing the inventory of work product, disqualified attorneys are not required to determine or assert which items of work product contain confidential information; they are only required to list each item and the details relevant to the trial court's analysis. Thus, inventory preparation will not require an admission that an item contains confidential information, because the inventory does not call for such evaluations. Furthermore, we do not understand Justice BRISTER's concerns about appellate review of work-product decisions. Appellate courts must frequently review discovery-related rulings in which one party is seeking to protect confidences from disclosure. The techniques employed for resolving such disputes will be the same. Finally, we have faith in the trial court's ability to determine whether an item of work product is unlikely to contain confidential information. In most cases, the trial judge who determines whether two matters are substantially related for purposes of disqualification will be the same judge who will be determining whether the work product contains confidences.

## VI

In this case, the trial court granted access to all the work product without determining whether it contained or reflected confidential information. This was an abuse of discretion, as Hartnett must be denied access to any part of the work product which is tainted. Because we have not previously established the standard governing the access to work product inquiry, we deny the petitions for manda-

mus without prejudice to afford Relators an opportunity to reurge their motions to the trial court in light of this opinion. *See Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex.1995); *Phoenix*, 887 S.W.2d at 836.

Justice OWEN issued a concurring opinion.

Justice BRISTER (Assigned)[3] issued a dissenting opinion, in which Justice HECHT and Justice RAMEY (Assigned)[4] joined.

Justice OWEN, concurring.

I agree with the dissent that the Court's solution is problematic. During the process that will determine if new counsel will receive disqualified counsel's work product, neither the former client who disqualified opposing counsel nor new counsel will have access to the work product. Neither will know or have any means of learning the extent to which it contains confidences or embodies legal theories based on confidences. How, then, can the former client or new counsel discern and then communicate to a judge what should and what should not be turned over by disqualified counsel? And, as the dissent points out, the Court's process may often lead the trial court to rely heavily on disqualified counsel who undertook to represent a client when they knew or should have known that it was improper to do so. The Court's procedures permit too great a risk that the former client's confidences will be used against it. However, the dissent's solution may result in unnecessarily duplicating a substantial amount of work at great cost. I would chart a middle ground.

The work product of disqualified counsel should typically fall into one of three gen-

---

**3.** Hon. Scott Brister, Judge, 234th District Court, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

**4.** Hon. Tom B. Ramey, Jr., Chief Justice, Court of Appeals for the Twelfth Court of Appeals District, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

eral classifications: work product that is (1) likely to be tainted, (2) unlikely to be tainted, and (3) perhaps tainted. The first category of work product would include disqualified counsel's notes, outlines, notebooks, memoranda, status reports, confidential communications, and work done by a consulting expert or jury consultant. These materials are likely to be tainted in a case such as this, i.e., when counsel has been disqualified because (1) its representation of a party was substantially related to its prior representation of another party and (2) it questioned the validity of work performed during that prior representation. I would hold that these types of work product and all core work product within the meaning of rule 192.5(b)(1)[1] cannot be transferred to new counsel. It would be virtually impossible for a court to sift through work that contains or is based on an attorney's mental impressions or legal theories to determine which were derived from the prior representation of an adverse party.

The second category of work product would include materials such as deposition summaries, document indices, and databases of document and deposition information. It is unlikely that these types of work product would be tainted, and generally, they would not contain core work product. If the client whose counsel was disqualified desires to transfer these materials to new counsel, it should be required to provide the opposing party an opportunity to view the materials to ensure that they do not reveal any confidences or legal theories derived from the prior representation of the opposing party by disqualified counsel. If there are objectionable materials, they could be redacted or withheld from new counsel, and an appropriate protective order could be entered if necessary. This procedure is analogous to situations contemplated by rule 192.5(b)(2) when a

party seeks to discover work product other than core work product because that party is in "substantial need of the materials in the preparation of [its] case and is ... unable without undue hardship to obtain the substantial equivalent of the material by other means." Tex.R. Civ. P. 192.5(b)(2)

Giving the client whose counsel has been disqualified the option of producing work product to the party whose confidences are in jeopardy allows the client who must retain new counsel to make a considered decision about whether it desires its new counsel to prepare the case without the benefit of work that has already been done. The client whose counsel has been disqualified could weigh any cost savings against the damage that might be done if its own confidences in the work product were revealed. A measure of protection could be afforded this client by limiting the opposing party to only a review of the material. The opposing party would not be permitted to copy or to use this work product, but only to identify any specific items that it contended were tainted.

The third category, materials that are perhaps tainted, would include legal research. If a client whose counsel has been disqualified desires to transfer research to new counsel, disqualified counsel should be required to provide a detailed list of all issues that have been briefed. The opposing party could then make a determination of what issues might involve tainted matters and seek an in camera inspection if necessary. This would focus and narrow the issues for a trial court.

The Court's procedures are impractical and unworkable. The trial court cannot simply assume from looking at inventories prepared by disqualified counsel that the actual documents or other materials do not contain the opposing party's confidences or

---

1. Rule 192.5(b)(1) defines core work product:

     (1) Protection of Core Work Product— Attorney Mental Processes. Core work product—the work product of an attorney or an attorney's representative that contains

the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories—is not discoverable. Tex.R. Civ. P. 192.5(b)(1).

that thoughts or theories reflected in the work product are not based on those confidences. The trial court must either review all of the work product or rely on evidence from disqualified counsel. Neither alternative is acceptable.

In camera inspection of work product will in some cases entail the review of hundreds of documents, hundreds of pages of deposition summaries, and extensive databases. The sheer volume of material in those cases will make it unlikely that the work product will receive meaningful review, particularly when the party whose confidences are at risk has no means of knowing what the work product contains and thus cannot assist the trial court in recognizing confidential information.

When disqualified counsel asserts that work product does not contain tainted matters, the client who disqualified that counsel will be required to take that assertion at face value or attempt to counter it without having any means of doing so other than surmise and suspicion. In resolving the dispute, the trial court must rely heavily on the integrity of disqualified counsel, who will be the only one who knows and understands what confidences the work product actually contains.

The client is afforded little protection under the Court's procedures. I therefore cannot support the Court's solution.

Justice BRISTER (Assigned)[1], joined by Justice HECHT and Justice RAMEY (Assigned)[2] dissenting.

The legal profession recognizes few duties more important than protecting a client's confidences. Because the Court's opinion opens the door to disclosure of those confidences, I dissent.

I agree with much of the Court's opinion. I agree Relators have not waived their objection to transfer of work product (Part II). I agree Ms. Anderson's attorneys should get any documents filed by or exchanged among the parties, subject to Relators' right to seek protection under current rules (Part III). *See* Tex.R. Civ. P. 76a, 192.6. I agree that disposition of the remainder of a disqualified attorney's files depends upon the reasons for disqualification, and that the reasons in this case justify restriction (Part IV). I part company with the Court only with respect to the extent of that restriction.

The Court's analysis of the few precedents that exist on this question is fair and thorough. I agree we should reject those precedents that require a balancing test or place the burden on a former client to point out confidences for protection (Parts V[B] & [C]). I disagree, however, with the Court's decision to reject the rule adopted by most courts (Part V[A]) in favor of one that apparently has never been tried by any court in the country.

I believe this rule will prove to be impractical, calling as it does for the parties to conduct piecemeal disputes about confidences they cannot disclose in documents they cannot see. I believe it unfairly shifts costs from the party who should bear them to others who should not. Most importantly, I believe the rule may prove to be more porous than protective in the critical area of trust and confidence between attorney and client.

# I

The question in this case is not whether a disqualified attorney may transfer files that do not reveal a former client's confidences. If the files contain nothing confidential, then of course there is no harm in transferring them. But how can one be sure?

1. Hon. Scott Brister, Judge, 234th District Court, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

2. Hon. Tom B. Ramey, Jr., Chief Justice, Court of Appeals for the Twelfth Court of Appeals District, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

Client confidences are not the same as attorney work product. A client confidence is any secret disclosed by a client to a lawyer. Tex. Disciplinary R. Prof'l Conduct 1.05(a). It need have nothing to do with a prior representation, or even with the law. It may be the name of a company targeted for takeover, or the price a client would pay for real estate. It may be a client's plans for marriage, for divorce, or for children. Even the most important client confidence may be no more than a name, a number, a list, a diagram, a password, or a plan. It may be as terrible as an admission of crime, as delicate as a family secret, as fleeting as an idea.

Because it is impossible to list every kind of client confidence, it is impossible for a trial judge to recognize and expunge every confidence from work product. Deposition summaries or research memos may be unlikely to contain client confidences, but only if that's all they are. While it is easy to imagine documents that probably contain no confidences, it is just as easy to imagine situations where they do. The difficult question presented by this case is whether to transfer files where, given the circumstances of disqualification proceedings, one cannot be sure.

## II

The Court recognizes, even expects, that confidences will be reflected in a disqualified attorney's files. The Court also recognizes that transfer of those confidences would defeat the purposes underlying the disqualification. But it stops short of the one measure that would practically and effectively accomplish those purposes, namely, barring the transfer of work product to successor counsel.

When a tainted lawyer moves to a new firm, that firm may no longer work on the case. Tex. Disciplinary R. Prof'l Conduct 1.09(b). The new firm is not allowed to wall off the tainted member or certain parts of the litigation. *Henderson v. Floyd,* 891 S.W.2d 252, 253–54 (Tex.1995). The same rule should apply when it is the client's file rather than the client's lawyer that moves to a new firm. Why should a firm be disqualified if it takes on the lawyer, but not if it takes on the lawyer's work product?

The Court adopts a different rule here, on the basis that all work product is unlikely to be tainted. Hopefully, the same might be said of lawyers. Some lawyers who switch sides might not know any client confidences, and those who do may be unlikely to share them. Nonetheless, a bright-line rule applies to lawyers, because it is impossible for a former client to prove what did or did not go on within the walls of a hostile firm. *Henderson,* 891 S.W.2d at 254. Former clients face the same obstacles with respect to work product they are not allowed to see.

To be consistent, the same rule should apply to work product that applies to lawyers and firms. A disqualified law firm should not be able to do indirectly what it cannot do directly. Only a complete bar on transfer would treat lawyers, their firms, and their work product the same.

This does not mean work product cannot be re-created. It must, however, be generated from some source other than the tainted lawyer's files. To the degree this requires wasteful duplication, it is a price that sometimes must be paid in a system of justice that depends to a large degree on its integrity for its power. *See, e.g., Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (prosecutor may use neither evidence improperly obtained nor the fruits of the poisonous tree).

## III

### A

The Court hopes to screen out confidential information by document inventories and *in camera* inspections. Given the difficulties inherent in disqualification cases, I believe these instruments are ill-suited for the purpose.

A document inventory or "privilege log" is useful in determining whether a privilege applies because one can compare, for example, a list of senders and recipients with a list of attorneys and clients. Client confidences, however, cannot be identified from matters that appear in a document inventory.[3]

In the first place, work product does not always fit into tidy categories. Attorney notes, memos to the file, status letters, and jury consultant reports, to name but a few, may cover many different claims, topics, and aspects of the case. Even where the general type of document or subject matter is more limited in scope, this information is still misleading if the document contains anything else. Confidences, after all, may easily appear in a short comment, suggestion, or handwritten note on any document, regardless of type or subject matter. In short, unless the inventory is completely candid and exhaustive, it may conceal more than it reveals.

But the Court's proposed inventory will be prepared (as it must) by none other than the disqualified attorney. By reason of the disqualification, a court has already found a risk of disclosure where this attorney saw none. Moreover, any admission that a document on the list contains confidential information from a former client would be an automatic admission of a new violation of the disciplinary rules. Tex. Disciplinary R. Prof'l Conduct 1.05(b). This is expecting too much.

Armed with this suspect inventory, trial judges are then asked to review each entry for its relationship to a prior representation. This will be no easy task. It is one thing to compare pleadings to see if two cases are substantially related, though the number of recent disqualification matters before this Court suggests that reasonable minds may differ even on this point. But it is quite another for a trial judge to check every letter, memo, note, report, summary, time sheet, and attachment on an inventory list to see if it might relate to a prior representation.

The Court suggests that successor counsel may assist the trial judge with other evidence, but I have trouble imagining what that might be. Clearly, none of the attorneys remaining in the case can swear out affidavits concerning the contents of documents they have never seen. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) (affidavits must unequivocally state facts upon which perjury can be assigned). Nor can the disqualified attorneys provide credible evidence that particular authors or documents are unlikely sources of confidential information, as this Court has never given any weight to such denials before. *In re American Home Products Corp.*, 985 S.W.2d 68, 74 (Tex.1998) (denials of access to confidential information irrelevant where there is a genuine threat of disclosure). Even lawyers acting in utmost good faith may not be aware of their receipt or use of confidential information. *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1463 n. 6 (Fed.Cir.1984). Given these weaknesses, I do not share the Court's confidence that an inventory list or other information will allow trial judges to make an informed decision without inspecting each and every document in the disqualified attorney's file. I doubt that will help much either, though, as any judicial inspection of documents would be not just *in camera* but in the dark. There is little point in asking trial judges to look for something without telling them what it is. But as this Court has often noted, a client should not have to describe its confidences to a trial judge in order to protect them. *NCNB Texas Nat. Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989). There is nothing self-identifying about client confi-

---

**3.** In an appropriate case, a date indicating preparation before a tainted lawyer arrived might justify transfer. *See EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1461 (Fed.Cir. 1984). Such documents would still need to be reviewed for post-taint additions or artful usage of dates. But in this case it is uncontested that the tainted attorneys were present at all times work product was prepared.

dences, especially to a judge unfamiliar with the client or the issues in the prior case.

And finally, what of appellate review? As a loss of confidentiality cannot be adequately remedied by appeal, appellate courts will have to oversee this process on a regular basis. This satellite litigation stems from motions filed four years ago, and has already been to this Court twice. By remanding for further proceedings instead of disposing of the issue now, the Court may be simply sending it around for another orbit.

### B

The Court justifies these risks and complexities by pointing to the delay and cost to Ms. Anderson if work product must be re-created. But she will hardly be starting from scratch. All members of the Court agree she will receive all pleadings, discovery requests, discovery responses, documents produced by any party, correspondence with the court, correspondence between the attorneys, and all exhibits and transcripts from the previous trial. This may not be everything her disqualified lawyers did, but they will still need a truck to make the delivery.

As to whatever work product remains, it seems to me there would be less delay and expense by simply telling successor counsel to start doing their own work now. If the Court is correct about the high burden imposed by the procedures it adopts, the end result may be about the same.

But even if the new procedures save some trouble and expense for Ms. Anderson, they do so by shifting them to the opposing parties and the trial judge. Parties who are not to blame for the disqualification should not have to bear its costs. A party whose confidences are at risk already incurs considerable cost in disqualifying an opposing attorney, costs that are probably unrecoverable. At least under a rule banning transfer of work product, that is the end of it. Under the

rule adopted today, it may only be the beginning.

Of course, there is nothing in the record to suggest Ms. Anderson will have to pay for duplicated work. Indeed, the client should not bear the cost in most cases. Before taking a case that may be substantially related to a prior representation, an attorney must fully disclose the existence, nature, implications, and possible adverse and advantageous consequences of the overlap. Tex. Disciplinary R. Prof'l Conduct 1.06(b), (c). If the attorney fails to do so, it is the attorney who must bear the costs. *Burrow v. Arce*, 997 S.W.2d 229, 241 (Tex. 1999) (client should not have to pay for services necessary because of lawyer's misconduct). If the attorney does disclose the conflict, then the client may choose to take the risk, but she should not be absolved from the consequences. Either way, only the party who is responsible for the disqualification bears the burden of delay and expense.

I agree with the Court that Ms. Anderson should not be deprived of her property without a compelling reason, but attorney-client confidentiality is a compelling reason. If the facts of a case justify depriving a party of her lawyer, I do not see why they fall short when considering her lawyer's papers.

### C

The Court points to two prior opinions to support its adoption of a rebuttable presumption in this case. The term used in those cases is the same, but the remedies adopted are not.

In *Phoenix Founders, Inc. v. Marshall*, the Court allowed a non-tainted firm to rebut the presumption that a newly-hired paralegal shared confidences with her new employers. 887 S.W.2d 831, 834 (Tex. 1994). But rebuttal was limited to a structural showing—the so-called "Chinese Wall"—proving the tainted paralegal had not worked on the litigation in the past and would not do so ever again. A similar "rebuttable presumption" in this case

would prevent use of tainted files ever again.

*In re American Home Products Corp.* also allowed an attorney in one firm to rebut the presumed receipt of confidential information from a tainted attorney in another firm. 985 S.W.2d at 81. Again, however, there was a structural separation-the two attorneys worked for different firms in cities almost two hundred miles apart, and because of the disqualification could never work together on the case again.

In both cases, the rebuttable presumption involved a structural separation that cut off the communication of client confidences both in the past and in the future. There is no similar separation between disqualified or successor lawyers and their files. The correct analogue to the wall adopted in previous cases would be a total restriction on the transfer of work product in this case. Instead of a wall, the Court has erected a gate.

### IV

A complete bar on transfer of work product is not a harsh remedy when compared to the rights the remedy is meant to protect. Occasionally crimes may go unsolved or injustices may be done because attorneys do not divulge all they know. But the preservation of clients' secrets and confidences is not an option. *Coker*, 765 S.W.2d at 399.

Work product can be re-created; confidentiality cannot. Because there is no practical way short of banning the transfer of work product to make sure the policies behind disqualification are fulfilled, I would grant the mandamus.