**Opinion issued November 7, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00123-CV

———————————

## IN RE TEXAS WINDSTORM INSURANCE ASSOCIATION, Relator

---

**Original Proceeding on Petition for Writ of Mandamus**
**From the 56th and 212th District Courts**
**Galveston County, Texas**
**Trial Court Case Nos. 09-CV-0147 & 12CV2015**

---

## O P I N I O N

By petition for writ of mandamus,[1] Texas Windstorm Insurance Association

(TWIA) challenges the trial court's order disqualifying the law firm of Martin,

---

[1]   The underlying cases are *City of Santa Fe v. Texas Windstorm Insurance Association*, No. 12CV2015 in the 56th District Court of Galveston County, Texas, and *In re: Hurricane Ike Litigation*, No. 09-CV-0147 in the 212th

Disiere, Jefferson & Wisdom, L.L.P. (MDJW) and its attorneys from representing TWIA in any of the consolidated Hurricane Ike lawsuits pending in Galveston County. Among other reasons, TWIA asserts that the trial court abused its discretion because there is no disqualifying conflict of interest under Rules 1.09 or 1.15 of the Texas Disciplinary Rules of Professional Conduct and because the disqualification movants failed to show actual prejudice.

We conditionally grant the petition for writ of mandamus.

## Background

The individual, commercial, and governmental-entity plaintiffs in the underlying consolidated cases allege that TWIA breached duties owed to them in the handling of insurance claims arising from damage caused by Hurricane Ike. Real party in interest Craig Eiland is a state legislator and an attorney. Through his law firm, A. Craig Eiland Attorney at Law, P.C., he represents plaintiffs in cases that are part of the consolidated Hurricane Ike litigation in Galveston County.

Chris Martin is an attorney who specializes in insurance matters. He has frequently lectured and written on insurance law. Martin was testifying before the Texas Legislature on a matter relating to insurance when he met Eiland. Thereafter Eiland occasionally contacted Martin to ask questions about insurance law, relating both to issues pending before the Legislature and to issues arising

District Court of Galveston County. The respondent is the Honorable Susan E. Criss.

2

from cases he was handling as an attorney. He retained Martin as an expert in two of his Hurricane Ike cases which did not involve claims against TWIA: the *South Coast Cement* case[2] and the *La Porte ISD* case.[3] But the two lawyers were also adversaries in other litigated Ike claims pending in Galveston County in late 2010, including cases in which Eiland, along with his co-counsel Steve Mostyn, filed lawsuits on behalf of multiple policyholders against State Farm Lloyds and related entities, which are represented by Martin.[4]

Eiland was retained by Galveston County to review its Hurricane Ike insurance claims and to determine if it "had any potential money due and owing" from TWIA. Although no lawsuit was ever filed in connection with the Galveston County matter, Eiland testified that he contacted Martin in January 2011 "to seek his expert counsel," particularly concerning TWIA's alleged "failure to pay overhead and profit and sales tax." Eiland contends that he was seeking Martin's

---

[2] *South Coast Cement Co. v. Philadelphia Indemnity Co. et al.*, No. 3:10-cv-00357 (S.D. Tex., Galveston Div.).

[3] *LaPorte Independent School District v. Westchester Surplus Lines Insurance Co.*, No. 4:10-cv-03657 (S.D. Tex., Galveston Div.).

[4] These included *Kirk Shulke & Elizabeth Ann Shulke v. State Farm Lloyds et al.*, No. 10CV3794 (56th Judicial Dist. Ct., Galveston County), *Diane Zissa v. State Farm Lloyds*, No. 10CV2876 (122nd Judicial Dist. Ct., Galveston County), *Shelton's New Beginnings, L.L.C. v. State Farm Lloyds*, No. 10CV2741 (10th Judicial Dist. Ct., Galveston County), and *James Stewart v. State Farm Lloyds*, No. 10CV3658 (122nd Judicial Dist. Ct., Galveston County).

3

assistance for the benefit of his client and as an "expert."[5]  He also claims to have

sought Martin's guidance to inform how to structure the operation of his law firm

"in terms of what cases and types of cases" he accepted and how he would

"handle" them.   Eiland  testified  that  Martin  orally  agreed  to  accept  the

representation and that they discussed the preparation of an expert report.[6]

> After initial discussion by telephone, Eiland sent Martin the following email:

> From:        A. Craig Eiland
> Sent:        Monday, January 17, 2011 6:22 PM
> To:          'Chris Martin'

---

[5]   In this regard Eiland testified: "I needed his expertise to advise me as a lawyer . . . on what to do and how to do it, as also to the extent allowed, to use him as an expert in the litigation on those issues.  So both.  Both to advise me and my firm in the representation of Galveston County and as an expert in the case when it got to the point, because I started to want to be able to point to and rely upon him and say . . . a law school professor and the guy that writes the book, here is his opinion, pay me the money."  He further testified that he and Martin discussed "me retaining him to advise me and to give an opinion."

[6]   Eiland explained his need for a report as follows:

> It's important when you represent governmental entities . . . it's different than representing an individual or a company because you know that there [are] elected officials who have to justify their decisions.  And so you want to make sure that you, No. 1, pay for the file and, No. 2, provide a broad foundation.  If you are going to ask the commissioners court and the county judge to make a decision to either accept an offer, reject an offer, to take a position, you need to have it; and that's one thing I wanted.  I didn't want just, Oh, I talked to Bob, and he told me this.  I wanted something in my file that I could rely upon, that I could show the commissioners if and when the time came as well as the county judge.

4

Subject:     Eiland re Confidential Consulting Expert Communication
             FW: Galveston County - Texas Windstorm Insurance
             Association

Chris,

To follow up on our discussions, attached is my demand letter and reasoning with exhibits. Let me know if you have any insight or opinions. I think that the Ghoman decision helps and hurts. It helps in supporting the opinion that you do not have to hire a General Contractor to get the O&P, but hurts re the Tax.

A Craig Eiland

Eiland attached several documents to this email. One was a copy of the federal district court opinion referenced in the email text, *Ghoman v. New Hampshire Ins. Co.*, 159 F. Supp. 2d 928 (N.D. Tex. 2001). Also attached was a "formal initial demand" letter addressed to TWIA and sent by Eiland on behalf of Galveston County. Eiland's letter was dated January 17, 2010, and it demanded the payment of "undisputed damages," which included contractor's overhead and profit (commonly known as "O&P") and sales tax. The letter referenced and attached commissioner's bulletins from the Texas Department of Insurance, dated from 1998 and 2008, addressing the payment of O&P and sales tax.[7]

---

[7]    In its 1998 Commissioner's Bulletin, the Texas Department of Insurance stated that "the deduction of prospective contractors' overhead and profit and sales tax in determining the actual cash value under a replacement cost policy is improper, is not a reasonable interpretation of the policy language, and is unfair to insureds." In 2008 the Department stated that its "position has not changed." The 2008 Bulletin explained:

5

Eiland had attached to the demand letter a chain of email correspondence dated from 2008 which appears to have been an interoffice TWIA communication. In response to a suggestion that "we may want to stress that a general contractor is needed in order to include the O&P," TWIA Vice President of Claims Reggie Warren stated that according to the Texas Department of Insurance, "that doesn't matter……..we need to add OH & P to arrive at the appropriate repair/replacement cost, regardless if a contractor is involved."

On the afternoon of January 20, 2011, Eiland sent Martin another email, the text of which stated simply, "Any luck?" Martin responded, "Yes, report will follow later tonight." Eiland replied, "Great, Thanks! Send bill." Five hours later, Eiland sent another email that stated, "Just a reminder."

Late that night, Martin sent Eiland an email bearing the subject line of "Re: Report." That email stated:

> While individual company policy forms have been approved for use in Texas, the method set forth in [the 1998 Bulletin] continues to be a standard method of determining actual cash value under replacement cost policies. Thus, the insured continues to be entitled to reasonable and necessary expenses to repair or replace the damaged property, less proper deduction for depreciation. These expenses would include the services of a contractor. The deduction of prospective contractors' overhead and profit and sales tax, in addition to depreciation in calculating actual cash value, is an improper claim settlement practice on policies that provide coverage on an actual cash value or replacement cost basis.

6

Craig,

When we spoke last Friday, you asked about the industry custom and practice of paying certain components of a property claim when the insured doesn't actually incur the cost of the line item in question. The example you gave involved a unit of government (here Galveston County) which didn't have to pay sales tax on repair materials. You mentioned your argument involving the payment of premiums for items such as sales tax as a justification for the insurer's obligation to pay.

Over the last four days, I have had extended conversations with very senior executives in the Claims Departments at Travelers, Zurich, CNA, Hartford, Fireman's Fund and State Farm specifically regarding units of government or quasi-units and generally regarding sales tax and O&P. These men are long time acquaintances who spoke to me as a friend to answer my questions because I occasionally seek their industry perspectives to help research or writing projects I undertake. For anonymity, I get candid accuracy.

On this issue, the reactions were consistent. The primary principal seems to be the indemnity nature of property coverage. In other words, property policies provide indemnity to the insured for losses to buildings and their component parts. To this end, each carrier exec articulated a similar thought around the idea of a loss incurred or "reasonably likely to be incurred." That point seems to be the industry dividing point on your precise question. As to sales tax for an entity who will never have to pay such sales tax, the issue is consistently addressed along the same lines of incurred or reasonably likely to be incurred. It can't be incurred for a unit of government so it is never paid under the aforementioned indemnity principal.

In contrast, O&P is something where the general contractor in many types of losses is one reasonably likely to be incurred and is thus generally paid even when not actually retained and paid. In my pattern and practice research, the commercial carriers seem to pay it simply based on the need for a GC and without regard to one having actually been retained and their charges incurred. State Farm, in contrast, at least requires a contract with or an estimate from a general contractor before it will make such a payment even if the loss will

7

clearly involve 3 or more trades or factors indicating the necessity of a GC. The other carriers don't.

The actual cash value concepts set forth in Ghoman are recognized and applied by those in the industry. The sales tax issue in Ghoman seems distinguishable from Galveston County along the same indemnity principal mentioned above—it will never be incurred so there is no loss to indemnify. A general contractor, however, is a different matter, at least theoretically, even for a county government. The results of my survey indicated that each carrier would deny sales tax but would pay O&P for the county in my "hypothetical."

Your position on O&P was well supported by the Commissioner's Bulletins and Ghoman. There are actually some additional cases and briefing I have in archives which might interest you. I have handled a dozen or so O&P cases in the last 13 years or so, most of which were putative class actions. There are also a lot of out of state cases which also support your position on O&P. If you want me to find the briefing in those cases, I can have a paralegal pull the archived files for you.

As a final point of refinement, your "premium" argument is somewhat misplaced. Premiums are actually determined based on historical past losses for the carrier and future risk factors (such as number of employees, amount of property owned, etc) for the insured. Premiums are not actually calculated based on individual factors such as the potential to pay sales tax on a loss. No carrier that I am aware of calculates premiums based on factors such as sales tax. The fact that prior losses which are aggregated included sales tax is of no significance to your argument. Instead, your better arguments center around the actual cash value, replacement cost, and indemnity principals discussed above and explained further in Ghoman.

So, I recommend you punt the sales tax issue but continue to push hard on the O&P issue. You are right on O&P, even for a county government.

> If you want me to pull the archives on my old O&P case briefing, let me know.
>
> Chris

Eiland responded by email within an hour:

> Thanks for the work and comments. I will keep them to myself, but in case the client (County) asks why I sought sales tax and settled for less, this obviously gives me some sound reasoning to give up on the issue. I appreciate your help. [P]lease send a bill as I don't want to be burden but want to keep you as a resource!

Martin did not send a bill. Eiland testified that over the ensuing 10 months until the Galveston County claim settled, he and Martin "met one time in person and then had a phone conversation and e-mail, a couple of e-mails, but once I had his opinion, that's all I needed at that point in time." Eiland also testified that during that time, he and Martin discussed unspecified "confidential" issues other than O&P and sales tax.

Approximately 20 months after Martin's email report to Eiland, in August 2012, TWIA orally retained Martin and his law firm, MDJW, as lead coordinating counsel for its Hurricane Ike litigation. In mid-September 2012, the City of Santa Fe, represented by Eiland, filed suit against TWIA, alleging that it had failed to pay overhead and profit completely and accurately. TWIA answered

the lawsuit on October 12, 2011, represented by MDJW. Four days later, Eiland forwarded Martin's January 20, 2011 email to Mostyn.[8]

In early December 2012, the City of Santa Fe amended its petition to seek the certification of a class action, in which the proposed class included "All Texas government entities . . . who were or are TWIA's policyholders who (1) suffered a covered loss caused by Hurricane Rita, Hurricane Ike, Hurricane Dolly, and/or Hurricane Humberto, and (2) Whose actual cash value damage adjustments did not include adequately calculated and timely tendered compensation for general contractors' overhead and profit."

The next week, the City of Santa Fe moved to disqualify MDJW from representing TWIA based on the January 2011 email communication between Martin and Eiland. In its motion to disqualify, the City alleged that in January 2011 Eiland had hired Martin to provide an expert opinion on TWIA's failure to pay O&P and sales tax to Galveston County. The City thus argued that MDJW had a conflict of interest arising from the firm's duty of loyalty to Eiland. The City further argued that MDJW had failed to disclose this conflict of interest

---

[8]  Both Eiland and Mostyn belong to the "Plaintiffs' Steering Committee" for the Galveston County Hurricane Ike litigation. The mandamus record does not disclose any joint-representation agreements or any other details about the formation of the committee. Eiland testified that his duties and responsibilities as a member of the committee were "to try to make sure that all lawyers that have cases are aware of issues and to coordinate the trial, the discovery and the litigation," and that he shared confidences with Mostyn and other lawyers on the committee.

to TWIA, thus violating Title 28, Section 5.4001 of the Texas Administrative Code, which requires disclosure of conflicts of interest by lawyers representing or seeking to represent TWIA in policyholder disputes. The City argued that this violation required MDJW's disqualification from representing TWIA for a period of five years.

TWIA denied the factual allegations in the motion for disqualification, calling them "blatant misrepresentation[s]," and it denied the existence of an attorney-client or otherwise privileged relationship between the City and Martin. TWIA also denied any disclosure to Martin of "any confidential client information which would relate to the City of Santa Fe or any of the plaintiffs who now have suits pending against TWIA."

In response, a "Supplemental Motion to Disqualify; Reply to TWIA's Response to Motion to Disqualify" was filed in both the *City of Santa Fe* putative class-action lawsuit and the consolidated Hurricane Ike litigation. This motion was filed not only by the City, but also on behalf of plaintiffs' counsel who were not parties and who had not intervened in the suit: Eiland, his law firm, and the "Plaintiffs' Steering Committee" (whose members were not identified in the motion).[9]

---

[9]   Galveston County, Eiland's client directly at issue in the January 2011 email communications, is not a named plaintiff or a member of the putative class in the *City of Santa Fe v. TWIA* action, nor is it a party to any other lawsuit

In addition to arguing that MDJW was barred from representing TWIA under the Texas Administrative Code, in the supplemental motion the movants argued that Martin and MDJW had a "former-client conflict of interest in representing TWIA adverse to Martin's previous representation of Eiland, in violation of Disciplinary Rule 1.09, and thus disqualification is required as a matter of law." The movants later filed a "Second Supplemental Motion to Disqualify" and "Reply to TWIA's Response to Motion to Disqualify," in which they added factual allegations and urged the same grounds for disqualification.

The trial court held evidentiary hearings on the disqualification motion over five days between December 14, 2012 and February 5, 2013. Both Eiland and Martin testified, giving directly opposing testimony about the facts underlying the dispute over whether they had entered into an attorney-client relationship in January 2011. Eiland said that he hired Martin both as an expert and as his lawyer. Martin denied ever having entered into an attorney-client relationship with Eiland, though he acknowledged that Eiland had previously hired him as an expert in two separate matters that did not involve TWIA: *South Coast Cement* and *La Porte ISD*. The disqualification movants offered testimony from a legal-ethics expert,

affected by the motion to disqualify. The disqualification motion only identifies Eiland and his law firm as having been former clients of Martin and MDJW. Also, there is no allegation that the City of Santa Fe, any member of the putative class, or any other disqualification movant had engaged Eiland in January 2011 or earlier to pursue a claim against TWIA.

and TWIA objected on the ground that it would be improper to offer expert opinion testimony about the law and legal ethics. The trial court overruled the objection, granting TWIA a running objection to having "a legal expert tell the court what the legal issues are." The witness gave opinion testimony that an attorney-client relationship existed between Martin and Eiland and that the relationship gave rise to a disqualifying conflict of interest as to Martin and MDJW's representation of TWIA. As a result of the trial court's admission of the movants' expert testimony, TWIA later secured a rebuttal expert who presented directly opposing opinion testimony.

The trial court granted the motion to disqualify. Its order disqualified Martin and MDJW from representing TWIA in any of the consolidated Hurricane Ike cases in Galveston County, and it included the following findings of fact and conclusions of law:

1. Martin and [MDJW] entered attorney-client relationships with Craig Eiland and A. Craig Eiland Attorney at Law, P.C. (collectively "Eiland") concerning multiple matters.

2. Neither Martin, nor Eiland have terminated Martin's attorney-client relationship with Eiland in connection with one such matter, the South Coast Cement case, in which Martin drafted the federal court complaint, advised Eiland on matters concerning his attorney-client relationship, and in which he has been designated as an expert witness.

3. In addition to retaining Martin as Eiland's attorney, Eiland also retained Martin to serve as an expert witness in connection with

13

Eiland's representation of Galveston County in a claim against TWIA for damages caused by Hurricane Ike.

4. Eiland also retained Martin . . . in the La Porte ISD case. However, Martin's engagement letter . . . did not limit Martin's engagement to expert witness work. Instead he wrote that he would provide "expert consultation."

5. Eiland currently represents the City of Galveston and the City of La Marque in connection with those cities' claims against TWIA for damages caused by Hurricane Ike.

6. Eiland communicated confidential information to Martin and [MDJW] in the course of Martin and [MDJW]'s representation of Eiland, including concerning the County of Galveston insurance claims that Eiland handled against TWIA.

7. Eiland also communicated confidential information to Martin and [MDJW] in the course of Martin's service as an expert witness in connection with Eiland's representation of Galveston County. In the Galveston County matter, Martin served as lawyer for Eiland and Eiland's firm and for Eiland's client (the County of Galveston) and as expert witness. Martin issued a written report for Eiland and Eiland's firm and Eiland's client in that matter. Eiland requested that Martin send Eiland a bill for the work Martin had done on that matter.

8. The matters that were the subject of Martin and [MDJW]'s attorney-client relationship with Eiland included, but were not limited to, (a) the potential recoveries for overhead and profit by Eiland's clients as a part of their Hurricane Ike damage claims against TWIA, and (b) structuring Eiland's operations in terms of the case and types of cases that Eiland accepted, and structuring Eiland's negotiation and litigation strategies.

9. Whether Eiland's clients in this case and the other Movants are entitled to recover overhead and profit as a part of their Hurricane Ike damage claims against TWIA is a significant, disputed issue in

this case and TWIA's position on that issue is adverse to Eiland's and the other Movants' position on that issue.

10. Martin and [MDJW]'s representation of TWIA in this case is substantially related to Martin and [MDJW]'s prior representation of Eiland. Martin's previous areas of representation of and advice to Eiland included representation and advice concerning the Galveston County insurance claim against TWIA for Hurricane Ike damages. Yet now Martin and his firm are representing TWIA adverse to Eiland concerning the City of Galveston (and others') insurance claims against TWIA for Hurricane Ike damages, including concerning the same or substantially similar elements of damages. Therefore, Martin and [MDJW]'s representation of TWIA in this case results in a violation of Texas Disciplinary Rule of Professional Conduct ("Disciplinary Rule") 1.09(a)(3).

11. Martin and [MDJW]'s representation of TWIA in this case in reasonable probability will result in a violation by Martin and [MDJW] of Disciplinary Rule 1.05. Therefore, Martin and [MDJW]'s representation of TWIA in this case results in a violation of Disciplinary Rule 1.09(a)(2).

12. The opinion that Martin provided to Eiland concerning the recovery of overhead and profit as a part of claims against TWIA in the course of Martin and [MDJW]'s prior representation of Eiland appears to be inconsistent with the position that TWIA has taken in previous claims handling of the same type of storm-damage claims. Martin's work product for Eiland is in issue in this case. Therefore, Martin and [MDJW]'s representation of TWIA in this case results in a violation of Disciplinary Rule 1.09(a)(1).

13. Martin and [MDJW] failed to disclose to TWIA any conflict of interest, specifically including their prior and ongoing representation of Eiland, before undertaking the representation of TWIA in this case. Because of that failure, 28 TAC § 5.4001(b)(4)(C)(iii)(V) is an absolute bar to Martin and [MDJW] representing TWIA in this case, which involves policyholder claims against TWIA. Further Disciplinary Rule 1.15(a)(1) requires Martin to withdraw from the representation of TWIA

15

because the representation will "result in violation of . . . applicable rules of professional conduct" and "other law." [MDJW] have refused to withdraw from representing TWIA and are continuing to represent TWIA in violation of 28 TAC § 5.4001(b)(4)(C)(iii)(V) and Disciplinary Rule 1.15(a)(1).

14. Martin's conflicts of interest under the Disciplinary Rules are imputed to all other [MDJW] attorneys. Disciplinary Rule 1.09(b) provides that "when lawyers are . . . members of . . . a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by" Rule 1.09(a).

15. Eiland and his law firm have not consented to Martin and [MDJW]'s representation of TWIA in this case.

16. Disqualification of [MDJW] is appropriate based on any one or more of the foregoing violations of the Disciplinary Rules.

TWIA filed a petition for writ of mandamus. In its petition TWIA argues, among other things, that the trial court abused its discretion in granting the motion to disqualify Martin and MDJW because there was no attorney-client relationship between Eiland and Martin, no conflict of interest under Rule 1.09, no violation of the Texas Administrative Code or, by extension, Rule 1.15(a)(1), and no showing of actual prejudice. TWIA also challenged evidentiary rulings and the trial court's findings that Martin was retained as an attorney and expert witness for Eiland.

**Analysis**

"Mandamus relief is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal." *In re Frank Motor Co.*, 361 S.W.3d 628, 630

16

(Tex. 2012) (orig. proceeding).  A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law, *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding), or when it acts without reference to any guiding rules or principles.  *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex. 1998) (orig. proceeding).  A trial court has no discretion in determining what the law is or in applying the law to the facts.  *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).  "Mandamus is appropriate to correct an erroneous order disqualifying counsel because there is no adequate remedy by appeal."  *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding).

Disqualification of a party's counsel is "a severe remedy."  *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)).  "It can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice."  *Id.*  Disqualification can delay proceedings in the trial court, require the client to engage a successor attorney, and, in appropriate cases, deprive the client of work product done on his behalf by the disqualified attorney.  *See In re George*, 28 S.W.3d 511, 515, 518–19 (orig. proceeding) (Tex. 2000).  Because of the serious consequences of disqualification of opposing counsel, such motions can be misused for delay or to

17

exert inappropriate leverage to force a settlement. *See, e.g.*, *Spears*, 797 S.W.2d at 658; *see also Developments in the Law—Conflicts of Interest in the Legal Profession*, III. *Conflicts of Interest in Private Practice*, 94 HARV. L. REV. 1284, 1285 (1981) (suggesting that such motions could also be misused for the purpose of disqualifying "dangerously competent counsel"). The law strongly discourages the use of motions to disqualify as tactical weapons in litigation. *See, e.g.*, *Spears*, 797 S.W.2d at 658; TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.08 & cmt. 10, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2013) (State Bar. R. art. X, § 9).

The movant has the burden of proof on a disqualification motion. *See In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 60 (Tex. 1998) (orig. proceeding). To prevent the abusive filing of such a motion for tactical reasons, the court must carefully evaluate the motion and record to determine if disqualification is warranted. *See In re Nitla*, 92 S.W.3d at 422. The Supreme Court of Texas repeatedly has stated that a trial court "must strictly adhere to an exacting standard" in ruling on disqualification motions. *E.g.*, *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 399–400 (Tex. 1989) (orig. proceeding). Consistent with the standard of review in mandamus proceedings, we review the trial court's ruling for abuse of discretion. *See, e.g.*, *id*. at 400 (trial court's "failure to apply the

18

proper standard of law to the motion to disqualify counsel was an abuse of discretion").

Although the disciplinary rules are not intended as standards for procedural decisions, courts often look to them as guidelines in deciding whether to grant a motion to disqualify counsel. *In re Nitla*, 92 S.W.3d at 422; *Nat'l Med. Enters. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996) (orig. proceeding). When a movant seeks disqualification based on an alleged violation of a disciplinary rule, he must carry the burden to establish the violation with specificity. *See Spears*, 797 S.W.2d at 656. "Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules" do not satisfy the exacting standard. *Id.* In addition, the party seeking disqualification based on violation of a disciplinary rule must also "demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification." *In re Nitla*, 92 S.W.3d at 422; *see also In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998) ("a court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification").

## I. Former-client conflict

The disqualification motion alleged a former-client conflict. The applicable Disciplinary Rule of Professional Conduct provides:

Rule 1.09.  Conflict of Interest: Former Client

(a)     Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

   (1)     in which such other person questions the validity of the lawyer's services or work product for the former client;

   (2)     if the representation in reasonable probability will involve a violation of Rule 1.05; or

   (3)     if it is the same or a substantially related matter.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09(a).

Although TWIA challenges many of the trial court's factual findings, including the findings that Martin had been retained as Eiland's attorney and as a testifying expert witness in the Galveston County matter, we do not reach contested issues of fact in an original mandamus proceeding. *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 686 (Tex. 2007) (orig. proceeding); *In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) (orig. proceeding).  For purposes of mandamus review, we assume that Martin represented Eiland, and that the scope of that representation embraced Eiland's legal strategies relating to Hurricane Ike claims and his business strategies relating to case selection and negotiation.

**A. Prejudice arising from adverse relationship to former client (Rule 1.09(a))**

At the outset, we note an apparent absence of true adversity between TWIA and a former client of Martin and MDJW, which is a fundamental precondition to

20

the application of Rule 1.09's prohibition of former-client conflicts of interest. The rule applies to "a lawyer who personally has formerly represented a client in a matter" and prohibits that lawyer from representing "another person in a matter adverse to the former client" without prior consent. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09(a). The comments to Rule 1.09 also specify that the rule "concerns the situation where a lawyer once personally represented a client and now wishes to represent a second client *against that former client*." *Id*. R. 1.09 cmt. 2 (emphasis supplied).[10]

That circumstance does not exist here. Among the disqualification movants, only Eiland and his law firm are former clients of Martin and MJDW. But as explained below, they are not now adverse to TWIA in any relevant sense. Some of the other movants—the plaintiffs in the underlying cases—are actually adverse to TWIA, but they are not former clients of Martin and MJDW. And the remaining movants, the other attorney members of the Plaintiffs' Steering Committee, are neither former clients nor personally adverse to TWIA in the litigation.

**1.** *No adversity with former clients.* The former clients at issue are Eiland and his law firm. Eiland and his law firm are involved as counsel in the pending lawsuits in which Martin and MDJW's disqualification is sought, but

---

[10] One of the policy reasons underlying the adversity requirement is to avoid discouraging lawyers from accepting "new, relatively modest matters" by transforming such engagements into lifetime commitments. RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 132 cmt. b (2000).

21

Eiland and his law firm are not actual parties to the lawsuits. Apart from acting in a representative capacity as plaintiffs' counsel, Eiland's only personal interest in these cases—his interest in earning a fee—is either separate from or at most derivative of the interests of his clients, who actually are directly adverse to TWIA in the litigation.

A person seeking to disqualify his former counsel need not always be a party to the subsequent suit. Nevertheless, there still must be some demonstration that the second representation is "adverse" to the disqualification movant. *Id.* R. 1.09(a). For purposes of the ethical prohibition of Rule 1.09, adversity has been described as "a product of the likelihood of the risk and the seriousness of its consequences." *Godbey*, 924 S.W.2d at 132. The trial court's disqualification order identifies only one disputed issue in the litigation as to which Martin's representation of TWIA is characterized as adverse to the movants' position: "Whether Eiland's clients in this case and the other Movants are entitled to recover overhead and profit as a part of their Hurricane Ike damage claims against TWIA." But based on the allegations of the disqualification motion and the evidence presented in support of it, the consequences to Eiland of any disclosures arising from Eiland's engagement of Martin cannot be presumed to be serious. Eiland sent his Galveston County demand letters, incorporating arguments suggested to him by Martin, directly to TWIA. Moreover Eiland sent the full text of Martin's

22

email report on the subjects of O&P and sales tax to another attorney, Mostyn, who in turn forwarded the entire report to a representative of TWIA. Thus the same documents relied upon as evidence of the Martin-Eiland attorney-client consultation were voluntarily disclosed by plaintiffs' counsel to their clients' adversary, TWIA. Martin's current representation creates no additional risk of unfair prejudice to the claimants arising from the disclosure of the information in either of those documents.

Unlike the situation presented by the *Godbey* case,[11] nothing in the mandamus record indicates that Eiland or any of the other movants are at risk of

---

[11] In *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996) (orig. proceeding), a law firm was disqualified from representing former psychiatric patients in their suits against a group of psychiatric hospitals. One lawyer from the firm previously represented a regional hospital administrator during an investigation of fraud and mistreatment of patients. *See Godbey*, 924 S.W.2d at 132–33. Although the administrator was not a party to the patients' lawsuits, he intervened to move for disqualification of his former counsel. *Id.* at 126. The court found a small but "not nonexistent" risk that the administrator would be affected by the litigation. *Id.* at 132. In determining that the second representation was adverse to the former-client hospital administrator, the Supreme Court of Texas noted that disqualification based on a former client conflict of interest is often based not merely on the fact of the prior representation, but on the attorney's duty to preserve the former client's confidences. *Id.* at 131. The Court held that "[a]dversity is a product of the likelihood of the risk" of a disclosure of confidences "and the seriousness of its consequences." *Id.* at 132. As to the hospital administrator, the Court reasoned that while the risk of disclosure was not great, the seriousness of the consequences of disclosure warranted disqualification. *See id.* at 132–33. As the Court vividly explained: "The chances of being struck by lightning are slight, but not slight enough, given the consequences, to risk standing under a tree in a

unfair prejudice or any other personal risk because of Martin's representation of TWIA. The evidence fails to suggest any adverse consequences that might arise from disclosure of as-yet undisclosed confidences. The trial court found that Eiland sought counsel from Martin regarding his representation of Galveston County and his demand for payment of O&P and sales tax. The evidence shows that Martin wrote an email indicating that Eiland's position with respect to O&P was "well supported" but that a governmental unit that did not incur sales tax likely would not be entitled to recover sales tax, all based on case law, Texas Department of Insurance Commissioner's Bulletins, and Martin's survey of insurance industry practices. In essence, this was a general discussion of the strengths and weaknesses of legal arguments applicable to aspects of windstorm insurance claims as asserted by governmental entities—a representation that would

---

thunderstorm. [The regional administrator] is not likely to be struck by lightning in the pending case, even though he is in the midst of a severe thunderstorm, but he is entitled to object to being forced by his former lawyer to stand under a tree while the storm rages on." *Id.* at 132–33.

not give rise to an issue conflict[12] or otherwise ordinarily preclude a lawyer "from later acting adversely to that client's interests in a litigated matter."[13]

Eiland's testimony added nothing more to this understanding of the record. At the hearing on the disqualification motion, Eiland was specifically asked on direct examination to explain his concern about Martin representing TWIA as "an adverse lawyer" against his clients:

> Q. [A]re you concerned about Mr. Martin representing Texas Windstorm Insurance Association as now an adverse lawyer against your clients?
>
> A. Yes.
>
> Q. And why is that?
>
> A. Well, how are we supposed to go tell the school board in Dickinson that we have this claim that TWIA failed to pay you over $300,000 in overhead and profit? I have an opinion and report when I represented Galveston County, which are kind of some of the same taxpayers, you know, Dickinson ISD taxpayers are also Galveston County taxpayers, and I have an opinion from TWIA's lawyer, and what am I supposed to do now?

Eiland's testimony thus articulated a concern about securing a new expert to represent Dickinson ISD, but there is simply no evidence that Martin's current

---

[12] *See, e.g.*, MODEL RULES OF PROF'L CONDUCT R 1.07 cmt. 24 (2013) ("The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest.").

[13] RICHARD E. FLAMM, LAWYER DISQUALIFICATION: CONFLICTS OF INTEREST AND OTHER BASES § 8.7 at 157 (Banks & Jordan 2003).

representation of TWIA harms Eiland or the other movants by precluding them from finding another expert to support their claims. Nothing in the mandamus record shows that Martin will be advancing any arguments against Eiland personally or that his representation of TWIA will subject Eiland to criminal or civil penalties or sanctions. *See, e.g.*, *Godbey*, 924 S.W.2d at 132. Rather, the risk to Eiland is that opposing counsel will be vigorously advancing arguments against his clients in these cases, which is a situation that exists in every adversarial lawsuit and is not the concern of Rule 1.09.

2. ***No showing of prejudice to non-clients.*** While former clients generally are not required to disclose confidential communications with their former counsel in order to make the showing of actual prejudice that is usually necessary to support the severe remedy of attorney disqualification, *see, e.g.*, *Coker*, 765 S.W.2d at 400, the movants who cannot claim to have been former clients of Martin—all of the disqualification movants other than Eiland and his law firm—are not excused from this burden. For example, in *Rio Hondo Implement Co. v. Euresti*, 903 S.W.2d 128 (Tex. App.—Corpus Christi 1995, orig. proceeding), the court addressed the circumstance of an attorney-disqualification motion filed not on the basis of a former-client conflict, but on the basis of information shared between lawyers for co-defendants pursuant to the joint-defense privilege. Recognizing that the scenario is not expressly addressed by the

Rules of Disciplinary Procedure, the court held that "a party who claims the joint defense privilege as a basis for disqualification of counsel must establish in an evidentiary hearing 1) that confidential information has been shared and 2) that the matter in which that information was shared is substantially related to the matter in which disqualification is sought." *Rio Hondo*, 903 S.W.2d at 132; *accord In re Skiles*, 102 S.W.3d 323, 327 (Tex. App.—Beaumont 2003, orig. proceeding). Having found that the disqualification movant failed to satisfy this burden, the court held that the trial court's refusal to disqualify counsel was no abuse of discretion. *Rio Hondo*, 903 S.W.2d at 132–33.

Nothing in the mandamus record shows that Eiland's colleagues on the steering committee or any of the plaintiffs will be prejudiced by Martin's acquisition of information by virtue of his representation of Eiland. *See In re Nitla*, 92 S.W.3d at 422; *In re Meador*, 968 S.W.2d at 350; *see also Rio Hondo*, 903 S.W.2d at 132–33.

No one can serve two masters,[14] but no such dilemma is presented on this record. Martin's representation of TWIA does not present any true adversity with respect to the interests of Eiland and his law firm, the only disqualification movants found to be former clients of Martin. And with respect to Eiland's colleagues on the steering committee and the plaintiffs in the consolidated

---

[14] *Matthew* 6:24; *see also* FLAMM, *supra* note 13, § 3.4, at 47 (discussing the Biblical origins of the direct adversity rule).

litigation, no actual prejudice to those movants has been shown so as to justify disqualification pursuant to Rule 1.09 based on the Martin-Eiland attorney-client relationship.

**B. Substantial relationship between matters (Rule 1.09(a)(3))**

Even if there were sufficient adversity between Martin's current representation of TWIA and his former representation of Eiland, no violation of Rule 1.09(a)(3) has been shown because of the lack of a substantial relationship between the representations. We review the trial court's contrary legal conclusion for abuse of discretion.[15]

In *NCNB Texas National Bank v. Coker*, 765 S.W.2d 398 (Tex. 1989), a motion to disqualify was filed based on a former-client conflict. In that case the Supreme Court of Texas observed, based on Rule 4-101 of the Texas Code of

---

[15] The dissent relies primarily upon *In re Butler*, 987 S.W.2d 221 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding), for the proposition that the determination of a substantial relationship "is necessarily a question of fact." Dissent at 17. *Butler* does not say that, nor can it be inferred from the opinion. In any event, contrary to the dissent's suggestion, a substantial-relationship finding is not so inherently fact-bound as to be effectively insulated from mandamus review. Nor is a finding of adversity. Instead, we review these and other aspects of a trial court's ruling on an attorney-disqualification order for abuse of discretion. *See Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 321 (Tex. 1994) (reviewing "the evidence presented" by "the *Coker* standard" to determine there was no abuse of discretion in the trial court's finding of a substantial relationship for purposes of denying a motion to disqualify counsel); *see also* W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S L.J. 3, 112 (2010); FLAMM, *supra* note 13, §§ 36.1–.2 (collecting authorities relating to review of disqualification orders for abuse of discretion).

Professional Responsibility (the predecessor to the current disciplinary rules), that "[t]he preservation of clients' secrets and confidences is not an option." *Coker*, 765 S.W.2d at 399. Rule 4-101 defined "confidence" and "secret" in the context of the attorney-client relationship, provided the general rule that a lawyer shall not knowingly reveal a client's confidence or secret, and listed several exceptions to the general rule. TEX. STATE BAR R., art. XII, § 9, DR 4-101 (TEX. CODE OF PROF'L RESP.), 34 Tex. B.J. 758 (1971, superseded 1990). Considering the severity of disqualification, the Court applied a "substantial relationship test" requiring proof of "the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary." *See Coker*, 765 S.W.2d at 400. To justify disqualification the movant must provide "evidence of specific similarities capable of being recited in the disqualification order." *Id.* Since *Coker* the Court has often acknowledged that "[i]f the lawyer works on a matter, there is an irrebuttable presumption that the lawyer obtained confidential information during the representation." *E.g.*, *In re Guar. Ins. Servs., Inc.*, 343 S.W.3d 130, 134 (Tex. 2011) (orig. proceeding).

Although the former Texas Code of Professional Responsibility applied in *Coker* did not include a specific provision regarding a former-client conflict of

interest, such a provision is included in the current disciplinary rules. *See* TEX.

DISCIPLINARY RULES PROF'L CONDUCT R. 1.09(a)(3) ("Without prior consent, a

lawyer who personally has formerly represented a client in a matter shall not

thereafter represent another person in a matter adverse to the former client . . . if it

is the same or a substantially related matter."). The "substantial relationship" test

"primarily involves situations where a lawyer could have acquired confidential

information concerning a prior client that could be used either to that prior client's

disadvantage or for the advantage of the lawyer's current client or some other

person." *Id.* R. 1.09 cmt. 4B.

The alleged conflict of interest in this case relates to Martin's initial

representation of another lawyer, Eiland, and Martin's subsequent representation of

a client whose interests are adverse to the interests of Eiland's current clients. The

aspects of the first representation that the trial court found to be substantially

related to the subsequent representation concern a policyholder's recovery of

overhead and profit and confidential communications concerning Eiland's legal

strategies relating to Hurricane Ike claims, including his case selection and

approach to negotiations. The San Antonio court of appeals addressed a similar

question of whether two representations were substantially related in *In re Drake*,

195 S.W.3d 232 (Tex. App.—San Antonio 2006, mand. denied). Attorney Dennis

Drake worked for the Bexar County Appraisal District for more than 20 years. *In*

*re Drake*, 195 S.W.3d at 234. In 2003, he left the appraisal district and went into private practice, and in 2004, he filed on behalf of his clients two lawsuits against the appraisal district disputing the market value of his clients' property. *Id.* The appraisal district moved to disqualify Drake under Rules 1.05 and 1.09 of the Texas Disciplinary Rules of Professional Conduct, and the trial court granted the motion. *Id.* The appraisal district's attorney conceded that "the facts in the prior representation" had no "involvement in this situation." *Id.* at 236. However, the appraisal district argued that Drake's cases involved "the same claims and defenses as past cases in which Drake represented [the appraisal district] because all cases involve the valuation of property." *Id.*

In reversing the trial court's disqualification of Drake, the court of appeals observed that the court's order listed only similarities between past and present matters but no specific similar underlying facts. *Id.* "For example, the trial court found that while Drake represented [the appraisal district], he advised the district on the type of expert to retain or the type of expert or witness the district would not want questioned; and he engaged in various activities, including preparing and responding to discovery requests, formulating defense strategy, trial preparation, and attending settlement conferences." *Id.* at 236–37. The court of appeals concluded that Drake was "familiar with the inner-workings" of the appraisal district, but there was no evidence that the facts that would be material to the

resolution of Drake's clients' cases were related to the facts in any prior case in which Drake represented the appraisal district. *Id.* at 237. The trial court erred by disqualifying Drake because "[c]onclusions that valuation issues exist in all cases, without further evidence that the underlying facts are similar, will not support the trial court's disqualification order." Further, because there was no substantial relationship between Drake's prior and current representations, Drake was "not subject to the conclusive presumption that [the appraisal district's] confidences and secrets were imparted to him." *Id.* Finally, considering the contention that Drake should be disqualified because of a potential violation of Rule 1.05, the court of appeals noted that Drake did not obtain confidential information about his client's cases, only knowledge about the strengths and weaknesses of appraisers and experts. *Id*. The court thus concluded that Drake did not receive confidential information that could be used to the appraisal district's disadvantage. *Id.*

As in *Drake*, the court's order and the record here do not support a conclusion that Martin's prior and current representations are substantially related to each other. The trial court's order found that Martin had been Eiland's attorney and an expert witness in connection with Galveston County's "claim against TWIA for damages caused by Hurricane Ike," including a finding that Martin "served as lawyer . . . for Eiland's client (the County of Galveston)." The court noted that Eiland "currently represents" other governmental agencies, specifically the City of

32

Galveston and the City of LaMarque in their claims against TWIA for damages caused by Hurricane Ike. The court found that the scope of Martin's representation of Eiland involved matters of "(a) the potential recoveries for overhead and profit by Eiland's clients as a part of their Hurricane Ike damage claims against TWIA, and (b) structuring Eiland's operation in terms of the cases and types of cases that Eiland accepted, and structuring Eiland's negotiation and litigation strategies." The court also noted that Eiland's clients had a "significant disputed issue" regarding the payment of overhead and profit and that the City of Galveston and other plaintiffs were seeking the same or substantially the same elements of damages from TWIA on their Hurricane Ike claims. From these factual determinations, the trial court concluded that "Martin and [MDJW's] representation of TWIA in this case is substantially related to Martin and [MDJW's] prior representation of Eiland."

Eiland argued in the trial court and on appeal that similarities between the claims made by Galveston County against TWIA and those made by the governmental entities that Eiland currently represents (the City of Santa Fe, the City of Galveston, and the City of LaMarque) in their suits against TWIA are evidence of a substantial relationship between Martin and MDJW's prior

33

representation of Eiland and their current representation of TWIA.[16] Eiland

contends this substantial relationship is sufficient to justify disqualification, listing

the following similarities between the Galveston County matter and matters

involving the cities of Santa Fe, Galveston, and LaMarque:

- first-party claims against TWIA;
- brought by a unit of government;
- arising out of Hurricane Ike;
- for breach of nearly identical standard commercial windstorm policies;
- for failure to properly pay O&P and sales tax;
- for improper claims handling following Hurricane Ike;
- for improper adjustment following Hurricane Ike;
- for failure to pay all damages owed under the policy following Hurricane Ike; and
- seeking actual damages, penalties, and interest.

Accepting the trial court's factual determinations to the extent they were

supported by evidence, we nevertheless conclude that the mandamus record does

---

[16] The dissent relies upon Eiland's own testimony that Martin's current representation is "substantially related" to the former representation, as well as an opinion to the same effect from the movants' legal expert. Dissent at 18–19. As discussed above, *see supra* note 15, the determination of a substantial relationship between representations for purposes of Rule 1.09 involves the application of a legal standard to facts found by the trial court. The trial court's conclusion that such a substantial relationship existed is part of the ruling under review in this mandamus proceeding, and as such Eiland's legal opinion and the legal opinion of the movants' expert cannot be treated as if they were evidentiary support for the ultimate conclusion which was solely the province of the trial judge. *Cf. Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 95 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("It is not the role of the expert witness to define the particular legal principles applicable to a case; that is the role of the trial court.").

34

not support the trial court's legal conclusion that Martin's representation of Eiland was substantially related to his subsequent representation of TWIA. First, the evidence shows that Martin only directly advised Eiland—and not Galveston County itself[17]—regarding Eiland's representation of Galveston County. The relevant prior representation is Martin's prior representation of Eiland, not any prior representation of a policyholder actually asserting a first-party Hurricane Ike claim against TWIA. Martin's first representation of Eiland therefore was not a first-party claim against TWIA; it was a lawyer-to-lawyer consultation, and there is no finding and no evidence to support a finding that Eiland's consultation with Martin specifically related to claims now asserted by any of Eiland's current clients.

Eiland suggests that the prior and current representations were substantially related in part because they arose out of the same event, Hurricane Ike. However the claims against TWIA are for improper claims settlement practices. The event that triggers TWIA's potential liability in each case is the alleged failure to settle the claims properly in each case, not the hurricane itself. As in *Drake*, the plaintiffs' claims in the underlying cases—even the claims of governmental

---

[17]    Contrary to the trial court's finding that Martin "served as lawyer" for Galveston County, Eiland himself testified that Martin was not Galveston County's attorney, noting the difficulty that would be involved in obtaining approval from Galveston County leaders for the association of another attorney.

entities alleging nonpayment of O&P—necessarily would be different in terms of factors such as the types of repairs and contractors needed, communications between the policyholder and TWIA, the amount still in dispute, and the basis for the dispute. With specific reference to the governmental-entity claimants' entitlement to reimbursement for O&P, Martin testified that the claims would hinge on "whether or not the municipality had the in-house ability to hire its own subcontractor, essentially acting as its own general contractor." The disqualification movants have not disputed the materiality of that factor or shown a substantial relationship in that regard between the now-settled Galveston County claim and the still-pending claims of the other governmental-entity claimants.

The other suggested similarities between the pending cases and the Galveston County matter are superficial,[18] and they do not reveal a connection between any of the essential disputes underlying the pending cases and Martin's

---

[18] *See, e.g.*, *J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Morris*, 776 S.W.2d 271, 278 (Tex. App.—Dallas 1989, no writ) ("A superficial resemblance between issues is not enough to constitute a substantial relationship."); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1031 (5th Cir. Unit B June 1981) (vacating disqualification order when movant showed "no more than a surface and superficial connection between the matters"). *See generally* FLAMM, *supra* note 13, § 8.5 at 152–53 (the "heavy" burden of proving a substantial relationship cannot be satisfied by "hypothetical conflicts, unsubstantiated speculation, conclusory allegations, vague claims of similarity, a catalogue of generalities, a showing of a merely superficial resemblance or connection between the two matters, or proof that the former and present matters involve similar causes of action" (footnotes collecting authorities omitted)).

prior advice to Eiland. Thousands of lawsuits have been filed in the aftermath of Hurricane Ike. Like the situation addressed in *Drake*, although there may be some factual similarities, there has been no showing that any current dispute is factually related to the Galveston County matter. There is nothing in the mandamus record that shows, for example, that the alleged improper handling of Galveston County's insurance claims was in any way factually related to the alleged improper handling of the City of Galveston's claims. There is no evidence that secrets divulged by Galveston County to its attorney would have any impact on that lawyer's representation of the City of Galveston or any other claimant.

Thus while the trial court's findings may compel the presumption that Martin obtained some familiarity with the inner-workings of Eiland's firm, there is no evidence that such information has any substantial relationship to the resolution of any currently pending claim. *See In re Drake*, 195 S.W.3d at 237. Even to the extent that O&P is at issue in all cases, Martin cannot be disqualified without further evidence that the underlying facts are similar. *See id*. Without a substantial relationship between Martin's prior and current representations, there can be no conclusive presumption that confidences and secrets were imparted to him. *See id*.

The mandamus record does not show that issues of a policyholder's entitlement to recover O&P or a governmental entity's entitlement to recover sales tax are significant disputes in all of the cases as to which the court granted the

37

motion to disqualify. The petitions filed in the City of Galveston and the City of LaMarque cases are in the mandamus record. These petitions generally allege improper and unfair claims settlement practices, but unlike the record evidence relating to Galveston County's claim against TWIA, these petitions do not focus on the O&P issue or specifically seek unpaid O&P as damages. The City of LaMarque's petition does not even mention "overhead and profit." The City of Galveston's petition includes an appendix identifying all the items that it contends are TWIA's responsibility, including "possible wind damage to all locations" but not specifically mentioning O&P. While the City of Galveston's petition alleges that TWIA "failed to pay adequate sales tax," it in no way indicates that payment of O&P is an issue, let alone a significant disputed issue in the case. Indeed, Eiland testified that with respect to the City of Galveston, TWIA had "paid their overhead and profit correct."

Although there was legal argument that the pending cases all involved the issue of O&P, and the putative class has been defined to capture entities asserting claims for O&P, there was little actual testimony given to establish that the O&P issue is disputed or that any dispute is significant. Eiland gave limited testimony about the common issue of O&P in his cases. During the hearings on the motion to disqualify, Eiland testified that that the Dickinson ISD had claims of $1.5 million that did not include O&P, and that the City of Santa Fe case involves "the failure to

38

pay overhead and profit completely and correctly." However he also testified that his frustration with improper failure to pay O&P to Galveston County stemmed from the fact that TWIA had correctly paid O&P to other governmental entities, including the City of Galveston.

The cases against TWIA all allege similar causes of action, but nothing in the trial court's order or the mandamus record explains how the actual disputes underlying these cases are substantially related to each other. Even to the extent some of the pending pleadings reference claims for recovery of O&P, Martin testified that he was not aware of any actual disagreement in any particular case, and the disqualification movants did not produce any evidence of one. The trial court's order specifically references Eiland's current representation of the cities of Galveston and LaMarque. However the order had the more far-reaching effect of disqualifying Martin and MDJW in all of the consolidated Hurricane Ike cases pending in Galveston County, regardless of any dispute about O&P.

Rule 1.09 requires disqualification if the matters are "the same or substantially related," not when the matters are merely similar. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09(a)(3). The movants' burden in this regard "requires evidence of specific similarities capable of being recited in the disqualification order." *Coker*, 765 S.W.2d at 400. Without a showing of a substantial relationship, Eiland and the other disqualification movants are not

39

entitled to an irrebuttable presumption that Martin and MDJW received some other unidentified but potentially harmful-if-disclosed confidential information from Eiland during that representation. *See id*. And no other evidence has been produced to demonstrate prejudice to the disqualification movants.

## C. Reasonably probable disclosure of confidences (Rule 1.09(a)(2))

The disqualification movants also invoked Rule 1.09(a)(2), which prohibits a representation that "in reasonable probability will involve a violation of Rule 1.05," which relates to the protection of confidential client information.[19]

---

[19]     Rule 1.05(b) provides:

Except as permitted by paragraphs (c) and (d), or as required by paragraphs (e), and (f), a lawyer shall not knowingly:

    (1)    Reveal confidential information of a client or a former client to:

        (i)    a person that the client has instructed is not to receive the information; or

        (ii)    anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's law firm.

    (2)    Use confidential information of a client to the disadvantage of the client unless the client consents after consultations.

    (3)    Use confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after

40

This subpart largely overlaps the prohibition contained in Rule 1.09(a)(3). TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09 cmts. 4 & 4B. The argument advanced by the real parties in interest in support of the trial court's ruling under Rule 1.09(a)(2) is predicated on their other arguments about the substantial relationship between Martin's representation of Eiland and the claims against TWIA currently pending in Galveston County. However we have rejected that premise, and thus the same reasons that underlie our analysis of adversity and the substantial relationship test also lead us to conclude that that the record does not support the trial court's determination of a reasonable probability that client confidences would be shared.

## D. Question about the validity of lawyer services or work product (Rule 1.09(a)(1))

Rule 1.09(a)(1) also is not a viable ground for the motion to disqualify. To argue that Martin's work would be called into question in the underlying cases is unavailing. In the context of the initial inquiry concerning the Galveston County claim, Martin told Eiland that his argument for the recovery of O&P was "well

---

consultation or the confidential information has become generally known.

(4) Use privileged information of a client for the advantage of the lawyer or of a third person, unless the client consents after consultation.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05.

supported" based on case law, insurance commissioner bulletins, and industry practice. There is no evidence in the mandamus record to show that the validity of Martin's email "report" has been questioned, particularly not in the sense in which a lawyer would have a conflict when contesting the validity of a will, contract, or other legal instrument he previously drafted. *See id.* R. 1.09 cmt. 3. During the hearings on the disqualification motion, Eiland's counsel tried, but failed, to establish this point through Martin's own testimony.[20] But no evidence was ever produced to show that the substance of Martin's email report has been disavowed

---

[20]
Q. Does this case involve issues potentially of overhead and profit?
A. Theoretically, sure.
Q. Well, in fact, the pleadings expressly state that, don't they?
A. Sure, but I'm not aware of any disagreement.
Q. So TWIA is admitting through you liability for all overhead and profit --
A. No, sir.
Q. -- consistent with the limitations and the opinions expressed in your report that you gave to Mr. Eiland?
A. I would answer the question by saying that what was expressed in my opinion is consistent with the commissioner's position in 1998 and the commissioner's position today regarding overhead and profit, regardless of whether it's a municipal entity or any other insured.
Q. Do you know it's not consistent with what TWIA has done over the years? Do you know that?
A. I don't know what TWIA has done over the years.
Q. So you may have given an opinion to Mr. Eiland that is flatly inconsistent with the actual conduct of TWIA in the past?
A. All I can say is that if a mistake has been made, TWIA's position is to rectify it. I don't know that TWIA has made a mistake on that precise issue in a case that has not been --
COUNSEL: Objection, nonresponsive.
THE COURT: Sustained.

by Martin or TWIA, or that it is inconsistent with TWIA's position in connection with the specific facts of any individual case.

## II.  Texas Administrative Code

The motion to disqualify asserted as an alternative ground for disqualification that Martin violated Rule 1.15(a)(1) of the Texas Disciplinary Rules of Professional Conduct, which provides: "A lawyer shall decline to represent a client or, where representation has commenced, shall withdraw, except [when ordered by a court to continue the representation], from the representation of a client, if . . . the representation will result in a violation of . . . law." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15.  The movants asserted that Martin and MDJW had violated a provision of the Texas Administrative Code pertaining to outside counsel's disclosure of conflicts of interest when representing TWIA in a policyholder dispute:

> If legal counsel accepts an engagement from the association to represent it in a dispute involving a policyholder claim against the association and fails to disclose a conflict of interest, as required in this clause, such legal counsel shall be barred for a period of five years, from the date on which the conflict of interest is disclosed to the association, from representing the association as legal counsel in any dispute involving a policyholder claim against the association.

28 TEX. ADMIN. CODE § 5.4001(b)(4)(C)(iii)(V) (2012) (Tex. Dep't of Ins., Texas Windstorm Insurance Ass'n Plan of Operation).  The Texas Administrative Code specifies that decisions regarding conflicts of interest in policyholder suits are

43

based only on "the Texas Disciplinary Rules of Professional Conduct and the official Comments to these rules and ethics opinions issued by the Professional Ethics Committee of the Supreme Court of Texas." *Id.* § 5.4001(b)(4)(C)(iii)(II). Having concluded that there is no conflict of interest under Rule 1.09, we likewise conclude that there was no conflict of interest for the purposes of section 5.4001.

## Conclusion

Having considered the application of the law to the facts found by the trial judge in this case, we conclude that the mandamus record is insufficient to support the trial court's conclusions that the disciplinary rules were violated. In light of the severity of the remedy of attorney disqualification and the Supreme Court's admonitions that such rulings must strictly adhere to an exacting standard, we conclude that the court erred in applying the law to the facts and by ordering the blanket disqualification of Martin and MDJW from representing TWIA in all Galveston County Ike cases.

We conditionally grant TWIA's petition for writ of mandamus and direct the trial court to vacate its February 5, 2013 order disqualifying MDJW and its attorneys from representing TWIA. We are confident the district court will promptly comply, and our writ will issue only if it does not.


                                             Michael Massengale
                                             Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Justice Jennings, dissenting.