# Supreme Court of Texas

No. 24-0245

In re Adeel Zaidi, A.K. Chagla and Prestige Consulting
d/b/a Turnaround Management Group,

*Relators*

On Petition for Writ of Mandamus

**Argued October 7, 2025**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Bland did not participate in the decision.

In this original proceeding, the relators challenge an order disqualifying their attorney because his legal assistant previously worked for the opposing side. A longstanding bright-line rule for side-switching legal staff requires disqualification unless minimal prophylactic measures were undertaken to safeguard prior client confidences from the risk of inadvertent disclosure.[1] At the inception of

---

[1] *Phx. Founders, Inc. v. Marshall*, 887 S.W.2d 831, 835 (Tex. 1994) (orig. proceeding); *Grant v. Thirteenth Ct. of Appeals*, 888 S.W.2d 466, 467 (Tex. 1994) (orig. proceeding); *see In re RSR Corp.* (*RSR II*), 568 S.W.3d 663, 664 (Tex. 2019) (orig. proceeding) (recognizing that the rule's application is limited

employment, the nonlawyer must be instructed not to work on matters worked on in prior employment. The relators acknowledge there is no evidence this occurred. But they argue the rule does not apply because the legal assistant was not switching sides when she was hired and did not work on the matter until six years later. They also assert that the real parties in interest waived their right to seek disqualification by not promptly filing their motion after their counsel received e-filing notifications listing the legal assistant's name.

We disagree. We hold that (1) regardless of whether a nonlawyer was switching sides when hired, that employee must be admonished at some time before commencing work on a later-arising conflict for the employing firm to avoid disqualification and (2) the e-filing notifications do not conclusively establish waiver. We deny the mandamus petition.

## I. Background

The underlying lawsuit began in 2009. Relators Adeel Zaidi, A.K. Chagla, and Prestige Consulting, Inc. are the defendants, and real parties in interest Apex Katy Physicians, LLC and its managing member Pankaj Shah are the plaintiffs. Shah was initially represented by Fred Wahrlich with Munsch Hardt Kopf & Harr, P.C. Wahrlich's former legal assistant is at the center of this disqualification dispute.[2]

---

to "side-switching legal staff"); *In re Meador*, 968 S.W.2d 346, 353-54 (Tex. 1998) (orig. proceeding) (describing the *Phoenix Founders* "bright-line rule").

[2] Although the plaintiffs use the term "legal assistant," the defendants refer to her as a "legal secretary" at their counsel's firm. For consistency, we use the former term. In this type of inquiry, "we take a functional approach, looking not only to labels and job titles but also to the side-switching employee's duties at the original employer." *In re RSR Corp.* (*RSR I*), 475

From 2009 to 2011, that legal assistant worked on the plaintiffs' side of the case for Wahrlich and Munsch Hardt. During that time, she "actively" participated in "strategic communications and key attorney work product," drafted and filed documents, took part in "several hundred" privileged attorney–client communications, and attended meetings—including some where Andrew Meade was present as counsel for the other plaintiff, Apex Katy Physicians. Those discussions and work product, Shah later averred, concerned "issues that remain central to the litigation now." In 2011, the legal assistant left Munsch Hardt to work for Hicks Thomas LLP, which did not represent any party at that time. Two years later, Wahrlich and Munsch Hardt withdrew from representing Shah, and Meade and his firm now represent both plaintiffs.

After a bench trial, the court rendered judgment in the plaintiffs' favor. Around that time, the defendants hired attorney Robin Harrison to represent them on appeal, and in 2016, the court of appeals reversed and remanded the case for a new trial.[3] That same year, Harrison joined Hicks Thomas—five years after that firm had hired Wahrlich's legal assistant. When Hicks Thomas screened Harrison for conflicts, the instant matter was not flagged because the firm did not track the legal assistant's prior work. Significantly, as the defendants acknowledge,

---

S.W.3d 775, 780-81 (Tex. 2015) (orig. proceeding); *see Grant*, 888 S.W.2d at 467-68 (applying the *Phoenix Founders* rule to a "legal secretary"). There is no dispute about the legal assistant's duties, label, and title with her original employer.

[3] *See Zaidi v. Shah*, 502 S.W.3d 434, 448 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

3

there is no evidence that Hicks Thomas or Harrison instructed her not to work on cases she had worked on in her prior employment.

Between 2017 and 2022, the legal assistant worked on this case with Harrison on thirteen occasions, performing "limited secretarial services" when his regular assistant was unavailable. As part of this work, she filed two case documents in March 2022. Those documents were electronically served on Meade and members of his firm, and the e-filing notifications listed the legal assistant's name as the filer on Harrison's behalf.

In January 2023, Shah's representative recognized the legal assistant's name on one of the notifications. Shah and Meade both averred this was the time they first became aware that Wahrlich's former legal assistant was working for Hicks Thomas. After researching whether this constituted a conflict, Meade notified Harrison and requested information on Hicks Thomas's screening measures. Harrison responded that the legal assistant did not recollect her prior work on the matter, had not shared any confidential information with him, and would be screened from the matter going forward. But the plaintiffs considered these steps too little, too late and moved to disqualify Harrison and Hicks Thomas in early March. The trial court granted the motion, and the court of appeals summarily denied relief.[4] The defendants now petition this Court for mandamus relief.[5]

---

[4] 716 S.W.3d 702 (Tex. App.—Houston [14th Dist.] 2024).

[5] After oral argument, we abated the proceeding to allow a successor trial judge to reconsider the original ruling. *See* TEX. R. APP. P. 7.2(b). Because the successor judge denied the defendants' motion for reconsideration, we have lifted the abatement and reinstated the case to the active docket.

## II. Discussion

No adequate appellate remedy exists to rectify the erroneous disqualification of counsel, so if the trial court's disqualification order was a clear abuse of discretion, mandamus relief will issue.[6] That standard is not satisfied here because the defendants failed to establish that denial of the disqualification motion was the only legally permissible outcome.[7]

### A.

Our profession recognizes few duties more important than protecting client confidences. Preserving those confidences is "not an option" but rather "of paramount importance."[8] This duty rests on the foundational premise that "[f]ree discussion should prevail between lawyer and client in order for the lawyer to be fully informed and for the client to obtain the full benefit of the legal system,"[9] which "ultimately serves the broader societal interest of effective administration of justice."[10] Client confidences must be zealously guarded because fears

---

[6] *See RSR I*, 475 S.W.3d at 778.

[7] *See In re Murrin Bros. 1885, Ltd.*, 603 S.W.3d 53, 56 (Tex. 2019) (orig. proceeding).

[8] *In re George*, 28 S.W.3d 511, 517 (Tex. 2000) (orig. proceeding) (internal quotation marks omitted); *see* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05(a)–(b) (imposing a duty on lawyers to protect confidential client information), cmt. 1 ("[T]he proper functioning of the legal system require[s] the preservation by the lawyer of confidential information of one who has employed or sought to employ the lawyer."), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A (TEX. STATE BAR R. art. X, § 9).

[9] TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05 cmt. 1.

[10] *Paxton v. City of Dallas*, 509 S.W.3d 247, 250 (Tex. 2017).

5

about potential disclosure would imperil the free flow of information—especially if a client is concerned that the information may later appear in an adversarial proceeding.[11] Once a secret has been disclosed, the proverbial bell cannot be unrung.

Because lawyers often employ assistants to aid in the rendition of professional services, legal staff are privy to confidences and may be a later source of inadvertent or deliberate disclosure.[12] To help "clients feel more secure" and "guard the integrity of the legal practice by removing undue suspicion that clients' interests are not being fully protected,"[13] we have established certain presumptions for nonlawyers who are directly supervised by attorneys and retained to assist with litigation.[14] If a nonlawyer worked on the other side of a matter in a prior employment, there is (1) a *conclusive* presumption that confidences were obtained from the prior representation and (2) a *rebuttable* presumption that those confidences were shared with the new employer.[15] The latter presumption is rebuttable for nonlawyers, in

---

[11] *See NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 399 (Tex. 1989) ("[T]rust necessary in any attorney–client relationship is destroyed if the client must be concerned that any information given the attorney may appear later in an adversarial proceeding."), *abrogated on other grounds by In re Thetford*, 574 S.W.3d 362, 373 n.16 (Tex. 2019) (orig. proceeding).

[12] *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 5.03 cmt. 1.

[13] *Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 131 (Tex. 1996) (orig. proceeding).

[14] *RSR I*, 475 S.W.3d at 780; *Phx. Founders*, 887 S.W.2d at 835.

[15] *In re Guar. Ins. Servs., Inc.*, 343 S.W.3d 130, 134 (Tex. 2011) (orig. proceeding).

contrast to lawyers,[16] because of concerns about their employment mobility and "the prejudice and economic harm that could result to a client" from the harsh result of disqualification in that scenario.[17]  But if a lawyer at the new firm directed the nonlawyer to work on the matter, "'including clerical work,'" that presumption is "*not rebuttable unless* the assigning lawyer should *not* have known of the conflict."[18]

When these presumptions apply and are not rebutted, a court must disqualify counsel.[19]  Because disqualification is a severe remedy that can "result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice,"[20]

---

[16] *See In re Mitcham*, 133 S.W.3d 274, 276 (Tex. 2004) (orig. proceeding) ("For attorneys, there is an irrebuttable presumption they gain confidential information on every case at the firm where they work (whether they work on them or not), and an irrebuttable presumption they share that information with the members of a new firm." (citations omitted)). *But see* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.10(a)(2) (eff. Oct. 1, 2024) (providing for other associated lawyers of a firm to avoid the prohibition against representing a client under certain circumstances by timely screening a disqualified lawyer, apportioning no fee to that lawyer, and giving prompt written notice to any affected former client).

[17] *In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 825 (Tex. 2010) (orig. proceeding); *In re Am. Home Prods. Corp.*, 985 S.W.2d 68, 75 (Tex. 1998) (orig. proceeding); *Phx. Founders*, 887 S.W.2d at 835.

[18] *Guar. Ins.*, 343 S.W.3d at 134 (quoting *Columbia Valley*, 320 S.W.3d at 828).

[19] *See In re Turner*, 542 S.W.3d 553, 555-56 (Tex. 2017) (orig. proceeding) ("A trial court must grant a motion to disqualify a firm whose nonlawyer employee previously worked for opposing counsel if the nonlawyer (1) obtained confidential information about the matter while working at the opposing firm and (2) then shared that information with her current firm.").

[20] *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding).

we have additionally required a demonstration of prejudice before an attorney may be disqualified in other contexts.[21]  In this context, however, actual prejudice is not required because it is a "virtually insurmountable burden" for a prior client to show that its counsel's former employee revealed confidences to that client's detriment.[22]  The presumed sharing of confidences is the prejudice; to conclude otherwise would defeat the purposes of the presumptions.[23]

The shared-confidences presumption is therefore "rebutted not by denials of disclosure, but by prophylactic measures assuring that legal assistants do not work on matters related to their prior employment,"[24]

---

[21] *See, e.g.*, *Murrin Bros.*, 603 S.W.3d at 57 (requiring a showing of prejudice "[e]ven if a violation of the disciplinary rules is established"); *Meador*, 968 S.W.2d at 351 (requiring a weighing of prejudice "where a lawyer, through no wrongdoing of his or her own, receives an opponent's privileged materials").

[22] *Grant*, 888 S.W.2d at 467 ("[A]ny rule focusing on actual disclosure would place a virtually insurmountable burden on the party seeking disqualification, since the only persons who know whether confidences were actually shared will generally be the very lawyers seeking to avoid disqualification."); *cf.* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.9 cmt. 3 ("A former client is not required to reveal the confidential information learned by the lawyer to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter."); *Godbey*, 924 S.W.2d at 131 ("[I]t would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences.").

[23] *See Phx. Founders*, 887 S.W.2d at 834-35 (noting that these presumptions serve "to prevent the moving party from being forced to reveal the very confidences sought to be protected" and "while a court must ordinarily presume that some sharing will take place, the challenged firm may rebut this presumption by showing that sufficient precautions have been taken to guard against any disclosure"); *cf. Godbey*, 924 S.W.2d at 132 (recognizing the "difficulty in proving a misuse of confidences, and the anxiety that a misuse may occur").

[24] *Mitcham*, 133 S.W.3d at 276.

which "encourages institutional measures to guard against any disclosure, whether deliberate or inadvertent."[25]   We have repeatedly emphasized that two preventative measures must be shown and are "*the only way*" to overcome the rebuttable presumption:

> (1) to instruct the legal assistant "not to work on any matter on which the [legal assistant] worked during the prior employment, or regarding which the [legal assistant] has information relating to the former employer's representation," and (2) to "take other reasonable steps to ensure that the [legal assistant] does not work in connection with matters on which the [legal assistant] worked during the prior employment, absent client consent."[26]

The first prong, which is plain and simple enough, will be the focus of our analysis below.  The second prong's "other reasonable steps" must include, "at a minimum, formal, institutionalized screening measures that render the possibility of the nonlawyer having contact with the file less likely."[27]  But whether these screening measures actually worked is not determinative.[28]   Instead, we have equated this requirement to "effective screening," and courts ultimately look to whether the second firm "'has taken measures sufficient to *reduce* the potential for misuse

---

[25] *Grant*, 888 S.W.2d at 467.

[26] *Am. Home Prods.*, 985 S.W.2d at 75 (quoting *Phx. Founders*, 887 S.W.2d at 835); *see Turner*, 542 S.W.3d at 556 ("*only* by a showing" (quoting *Columbia Valley*, 320 S.W.3d at 824)); *RSR I*, 475 S.W.3d at 780 ("only be overcome by"); *Guar. Ins.*, 343 S.W.3d at 134 ("only way").

[27] *Columbia Valley*, 320 S.W.3d at 826.

[28] *Guar. Ins.*, 343 S.W.3d at 135.

of confidences to an *acceptable* level.'"[29]  In evaluating this second prong, we have directed courts to take a "flexib[le]" approach and employ a "fact-intensive, multi-factor inquiry."[30]

Together, these distinct requirements—an instruction and effective screening—"minimize the danger" that a legal assistant will inappropriately convey confidential information, even inadvertently.[31] Strict adherence is required.[32]  These steps align with a supervising lawyer's obligation under our disciplinary rules (1) to "make reasonable efforts to ensure" a nonlawyer employee's conduct "is compatible with the professional obligations of the lawyer" and (2) to instruct the nonlawyer "regarding the obligation not to disclose information relating to representation of the client."[33]  As we have said before, "this is a small

---

[29] *Id.* at 134-35 (quoting *Phx. Founders*, 887 S.W.2d at 836).

[30] *Id.* at 135-36.

[31] *Am. Home Prods.*, 985 S.W.2d at 75; *see Turner*, 542 S.W.3d at 557 n.2 ("Whether the subsequent screening measures were effective is a question separate from the provision of the preliminary instruction.").

[32] *Am. Home Prods.*, 985 S.W.2d at 76.

[33] TEX. DISCIPLINARY R. PROF'L CONDUCT 5.03(a) & cmts. 1–2.  This general obligation also extends to the employing law firm.  *See id.* R. 1.06 cmt. 19 ("A law firm is not prohibited from representing a client . . . merely because a nonlawyer employee of the firm . . . has a conflict of interest arising from prior employment . . . .  But the firm must ordinarily screen the person with the conflict from any personal participation in the matter to prevent the person's communicating to others in the firm confidential information that the person and the firm have a legal duty to protect."); *id.* R. 5.03 cmt. 2 ("Each lawyer in a position of authority in a law firm . . . should make reasonable efforts to ensure that the organization has in effect measures giving reasonable assurance that the conduct of nonlawyers employed . . . by . . . the firm . . . is compatible with the professional obligations of the lawyer.").

burden when balanced against the threat of confidences being revealed."[34]

## B.

At first blush, our precedent straightforwardly requires disqualification in this case because the legal assistant worked on both sides with no prior instruction. She is conclusively presumed to have obtained client confidences at the first firm (Munsch Hardt) and, at a minimum, rebuttably presumed to have shared those confidences at the second firm (Hicks Thomas). Plaintiff Shah never consented to the legal assistant working on the matter at Hicks Thomas, and the required instruction was not provided before she worked on the case for that firm. In *Turner*, we held that "if a firm fails to establish that it met the first prong by instructing the nonlawyer employee to refrain from working on any conflicted matters, we need not reach the effectiveness of the firm's

---

In 2024, we adopted a new version of rule 1.10, which provides for the timely screening of disqualified attorneys under certain circumstances. *Id.* R. 1.10(a)(2); *see supra* note 16. In a comment, we noted that "[p]aragraph (a) also does not prohibit representation by others in the law firm if the person prohibited from involvement in a matter is a nonlawyer, such as a paralegal or legal secretary." *Id.* R. 1.10 cmt. 3. This version of the rule was not in effect at the time of the trial court's disqualification order. Nor does it change the minimal preventative requirements to protect confidences our case law has established for side-switching nonlawyers. *Cf. id.* Preamble: Terminology & cmt. 6 (eff. Oct. 1, 2024) (defining "Screened" to include "the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect" and commenting that "[s]creening should include firm staff").

[34] *Columbia Valley*, 320 S.W.3d at 828.

screening measures under the second step," and the disqualification motion must be granted.[35]  So too here.

The defendants do not ask us to overrule any precedent.  Instead, in three points, they attempt to distinguish our authority and argue that no instruction was required given the facts of this case.  On close examination, we find these arguments wanting.

First, the defendants claim an admonishment would have had "little effect" when the legal assistant was hired because the conflict did not arise until years later.  We cannot accept that distinction.  In our experience, paralegals, secretaries, and other legal assistants aiding the bar are, by and large, commendably diligent, respectful, and ethical.  For these employees, an instruction is vital because they usually "do not have legal training and are not subject to professional discipline."[36]  We are confident most legal staff, when admonished, will faithfully comply to the best of their abilities and not work on conflicted matters, including those that arise years later.[37]  Accordingly, an instruction when a firm

---

[35] 542 S.W.3d at 556-57.

[36] TEX. DISCIPLINARY R. PROF'L CONDUCT 5.03 cmt. 1; *see* Richard E. Flamm, *Lawyer Disqualification: Disqualification of Attorneys and Law Firms* § 28.7 (2d ed. 2014) ("[B]ecause non-lawyers may not always be as sensitive to the importance of safeguarding client confidences as attorneys are, there may be even more reason to worry about the sanctity of confidences in a case[] where a non-lawyer has moved to another firm than when an attorney has done so.").

[37] Because a small number of legal staff may not satisfy this ideal, firms must do more than merely admonish the nonlawyer, as we have noted above. *See Columbia Valley*, 320 S.W.3d at 826 ("[A] simple informal admonition to a nonlawyer employee not to work on a matter on which the employee previously worked for opposing counsel, even if repeated twice and with threat of

hires a nonlawyer is a best practice to guard against disclosures and conflicts. That said, if the conflict did not exist at that time, a failure to instruct may be remedied later to avoid disqualification. As we explained in *Turner*, "regardless of whether the second firm knows of the precise conflict," the nonlawyer must be instructed "to refrain from working on conflicted matters *before* she commences work on a particular matter"—not necessarily at the time of hiring.[38]

This makes sense. Requiring an instruction before a nonlawyer commences any work on a conflicted matter is a bright-line rule that ensures clear and predictable outcomes, minimizes collateral litigation over disqualification, and enables firms to structure their practices accordingly.[39] If instructed, nonlawyers are put on notice of their ethical

---

termination, does not satisfy the 'other reasonable measures' a firm must take to properly shield an employee from the litigation."). Moreover, these institutionalized screening measures help all employees at a firm understand its "expectations for guarding against conflicts of interest" and preserving confidences. *Id.*

[38] 542 S.W.3d at 557. Our opinions have at times used language implying that, consistent with best practices, the time of hiring is the relevant time for an instruction. *See, e.g.*, *id.* ("The failure to provide this general instruction to a new employee creates an unacceptable risk of disclosure[.]"); *Phx. Founders*, 887 S.W.2d at 835 (noting that the "newly-hired paralegal" should be admonished). But we have never held that an instruction must occur at that time to avoid disqualification, especially when the conflict arises later.

[39] We acknowledge that this may lead firms and their human resources departments to adopt pro forma instructions designed to merely satisfy this rule. Although a perfunctory instruction may leave a less indelible imprint, the admonishment still provides valuable information and training to a new nonlawyer employee. We hope firms will go beyond these minimal requirements and instruct their legal staff in a manner to convey the significance of guarding against conflicts and protecting prior client confidences. *See, e.g.*, *Guar. Ins.*, 343 S.W.3d at 136 (noting that the firm

13

obligations and are reasonably likely to inform the supervising lawyer when assigned work creates a conflict.[40]  To this end, it is immaterial whether the instruction is given when an employee is hired or at any other time before the employee commences work on the conflicted matter.  But once a nonlawyer works on the matter at a lawyer's direction, the shared-confidences presumption is "*not rebuttable unless* the assigning lawyer should *not* have known of the conflict."[41]  Absent a prior instruction, it would be difficult (if not impossible) to demonstrate that the assigning lawyer should *not* have known of the conflict.[42]

Applying *Turner*'s rule, we conclude that the defendants failed to rebut the shared-confidences presumption.  The conflict arose in 2016 when Harrison joined Hicks Thomas, and the legal assistant became a

---

instructed the nonlawyer to refrain from working on matters on which he had worked previously in multiple ways: his hiring orientation, confidentiality agreement, and employee handbook, which directed him "to notify his supervising attorney immediately if he realized a conflict").

[40] *See* RESTATEMENT (THIRD) OF THE L. GOVERNING LAWS. § 123 cmt. f (A.L.I. 2000) ("Nonlawyer employees of a law office owe duties of confidentiality by reason of their employment.").  If after being instructed, the nonlawyer did not remember the conflicted matter when asked to work on it, the employing firm may still be able to avoid disqualification by demonstrating that it had effective screening measures in place, even if the measures failed to actually screen the nonlawyer.  *Guar. Ins.*, 343 S.W.3d at 135-36.

[41] *Guar. Ins.*, 343 S.W.3d at 134.

[42] *See id.* at 136 (holding that there was "no evidence the supervising attorney reasonably should have known about the conflict" based, in part, on the fact that the nonlawyer had been properly instructed even though he forgot about the matter and did not inform the lawyer about the conflict).  Under our disciplinary rules, the obligation to instruct lies not just with the firm, but also with the lawyer having direct supervisory authority over the nonlawyer.  TEX. DISCIPLINARY R. PROF'L CONDUCT 5.03(a) & cmts. 1–2; *see supra* note 33.

side-switching nonlawyer as a matter of fact when she commenced work on the case the following year.[43]  Thus, a failure to instruct the legal assistant when she was hired in 2011 could have been remedied at any time before 2017,[44] and disqualification could possibly have been avoided.  But as the defendants concede, no evidence supports that this occurred.

Second, the defendants advocate for a *de minimis* exception to this rule.  In their view, a prior instruction was not required because no genuine threat of disclosure existed given the length of time between when the legal assistant worked on each side, the type of work she performed at Hicks Thomas,[45] the fact that the case had already been tried, and Harrison's testimony that no confidences were disclosed to him.[46]  We disagree.  *Turner*'s rule is easily administrable and imposes

---

[43] Although the legal assistant was not formally assigned to work with Harrison on the case, he instructed her to perform tasks on the matter.  *See Columbia Valley*, 320 S.W.3d at 827-28 ("We fail to see a meaningful distinction between 'assigning' a nonlawyer to a case versus having the nonlawyer perform work on the case without a formal assignment.").

[44] For example, a firm could employ annual conflict reviews or trainings for its legal staff as additional prophylactic measures to help ensure they have been properly admonished.  Although our cases do not necessarily require such steps, the potential consequence of disqualification may incentivize these or similar "institutional measures to guard against any disclosure, whether deliberate or inadvertent."  *Grant*, 888 S.W.2d at 467.

[45] *But see id.* at 468 (noting that limited tasks "such as typing, filing, and scheduling" still "posed an unacceptable danger of a prohibited disclosure").

[46] From our review of the record, we have no reason to doubt Harrison's testimony.  But our precedent has determined that the legal system is best served by a rule that focuses on prophylactic measures to address genuine

only a slight burden on firms as they discharge the paramount duty to protect confidences. When possible, we strive to avoid "inviting greater complexity and uncertainty into the law by drawing ever finer distinctions in an effort to account for the factual vagaries that so often test the edges of bright-line rules."[47] What is more, our test already incorporates *de minimis* considerations in the second prong's multi-factor inquiry to determine whether "*other* reasonable steps" were taken.[48] As we said in *Turner*, however, "that inquiry assumes the second firm provided the initial instruction to the nonlawyer employee to refrain from working on conflicted matters."[49]

---

threats of disclosure and not on whether actual disclosures occurred. *See Am. Home Prods.*, 985 S.W.2d at 75 (recognizing that unequivocal and uncontroverted testimony "from lawyers that a legal secretary did not reveal anything to them" does not raise a fact question on that issue and is no evidence to overcome the rebuttable presumption).

[47] *Myers-Woodward, LLC v. Underground Servs. Markham, LLC*, 716 S.W.3d 461, 469 (Tex. 2025); *see* Ronald D. Rotunda, *Conflicts Problems When Representing Members of Corporate Families*, 72 NOTRE DAME L. REV. 655, 667-68 (1997) (explaining that in the disqualification context, "there is a need for brighter lines and clearer tests so that firms know what to do," and law firms and clients "understandably[] would like to know what the rules are so that they can obey them before a disqualification motion is ever filed").

[48] *Columbia Valley*, 320 S.W.3d at 824 (emphasis added) (quoting *Am. Home Prods.*, 985 S.W.2d at 75); *see id.* at 824-25 ("To determine whether the screening used by a firm is effective, we have said that the following factors may be considered: (1) the substantiality of the relationship between the former and current matters; (2) the time elapsing between the matters; (3) the size of the firm; (4) the number of individuals presumed to have confidential information; (5) the nature of their involvement in the former matter; and (6) the timing and features of any measures taken to reduce the danger of disclosure.").

[49] 542 S.W.3d at 557 n.2.

16

Indeed, when a nonlawyer has worked on both sides of a case, we have described this as "a serious conflict of interest," raising significant "concerns about client confidentiality and the integrity of the legal system."[50] Parties have every right to be worried about a genuine threat of disclosure on learning that their counsel's former employee, who had been privy to confidences, is now employed by opposing counsel *and* has actually worked on the same matter for the other side—here, for over five years intermittently.[51] We decline the defendants' invitation to adopt a *de minimis* exception to *Turner*'s rule.

Finally, the defendants contend that the trial court must weigh the prejudices to each side before disqualifying counsel. No doubt, the prejudice to the defendants resulting from the disqualification of their counsel would rest heavily on the scales, if weighing were required. And the defendants point to other contexts where we have required a showing of actual prejudice; for example, when disqualification is based on the violation of a disciplinary rule[52] or "where a lawyer, through no wrongdoing of his or her own, receives an opponent's privileged

---

[50] *Columbia Valley*, 320 S.W.3d at 826.

[51] *See id.*

[52] *See Murrin Bros.*, 603 S.W.3d at 57 ("Even if a violation of the disciplinary rules is established, the party requesting disqualification must also show it will suffer prejudice if disqualification is not granted."); *In re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 336-37 (Tex. 1999) (orig. proceeding) (noting that even if counsel "violated the 'spirit' of the rule," his "actions did not cause any prejudice that would require disqualification"); *Ayres v. Canales*, 790 S.W.2d 554, 557-58 (Tex. 1990) (orig. proceeding) (requiring for disqualification a demonstration of "actual prejudice . . . resulting from the opposing lawyer's service in the dual roles" as both counsel and witness in violation of the disciplinary rules).

materials."[53] But we have never required proof of actual prejudice or a weighing of prejudices when disqualification is based on the presumed sharing of confidences by an attorney or side-switching nonlawyer.[54] As already noted, this would defeat the purposes of the presumption framework.[55] To show actual prejudice, a prior client would have to disclose the very confidences it seeks to protect and then overcome an almost insurmountable burden of showing that the confidences were revealed to members of the second firm to the prior client's harm.[56] We have explained that it would be "virtually impossible" for a client to demonstrate that his former attorney "revealed his confidences to his

---

[53] *Meador*, 968 S.W.2d at 351-52 (establishing factors that include the weighing of prejudice to the parties but noting that "these factors apply only when a lawyer receives an opponent's privileged materials outside the normal course of discovery"); *see Murrin Bros.*, 603 S.W.3d at 57 (quoting one of the *Meador* factors while generally noting that in "addition to the movant's burden to show prejudice, the trial court should also consider 'the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney'" (quoting *Meador*, 968 S.W.2d at 350)).

[54] *E.g.*, *Am. Home Prods.*, 985 S.W.2d at 75-77 (side-switching nonlawyer); *Godbey*, 924 S.W.2d at 131-32 (attorney); *see Meador*, 968 S.W.2d at 351 (explaining that a court has the power "to disqualify an attorney even though he or she has not violated a specific disciplinary rule").

[55] *See supra* note 23 & accompanying text.

[56] *George*, 28 S.W.3d at 516-17; *Grant*, 888 S.W.2d at 467; *see George*, 28 S.W.3d at 517 ("To compel the client to show . . . the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer–client relationship." (quoting *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F. Supp. 265, 269 (S.D.N.Y. 1953))).

harm, and he should not be required to do so."[57]  The same is true for side-switching nonlawyers.

The defendants' proposed standard would also present other intractable problems.  For example, it may be difficult for a prior client to remember what confidences had been disclosed when either the events occurred long ago, as here, or involved a lengthy attorney–client relationship.[58]  And for corporate clients, the difficulty is compounded because "several different people may have disclosed its confidences."[59]  Further, a side-switching nonlawyer's knowledge of confidences is unlike privileged materials obtained outside the discovery process.  Privileged materials are "tangible" and "can be examined" to separate tainted and untainted information.[60]  As a result, "lesser means to remedy the moving party's harm" may be readily available.[61]  In contrast, a mind's inner workings are often opaque and its contents not easily partitioned.[62]  Our presumptions best protect the confidences that

---

[57] *Henderson v. Floyd*, 891 S.W.2d 252, 254 (Tex. 1995) (orig. proceeding).

[58] *George*, 28 S.W.3d at 517.

[59] *Id.*

[60] *Id.* at 519.

[61] *Nitla*, 92 S.W.3d at 423 (noting that the moving party "could only demonstrate that reviewing the [privileged] documents might have enabled [opposing] counsel to identify four new witnesses to depose" and "less severe measures, such as quashing depositions, could cure [the moving party]'s alleged harm").

[62] *See George*, 28 S.W.3d at 519 ("Unlike the contents of a lawyer's mind, work product is tangible and can be examined.  Untainted work product can be separated from tainted work product."); *see also Westinghouse Elec. Corp. v.*

19

may be contained therein. Accordingly, we hold that the presumed sharing of confidences, if not rebutted, is the prejudice and trial courts need not further weigh the prejudices for disqualification when a nonlawyer has worked on both sides of a matter.

At bottom, an instruction is a simple, but effective, first-line defense in guarding against inadvertent or deliberate disclosure of prior-client confidences.[63] Adhering to this modest requirement "prevents litigation such as this that needlessly expends the time and effort of the parties and the courts."[64] Because no instruction was given before the legal assistant worked on the conflicted matter, the trial court properly exercised its discretion so long as the plaintiffs did not waive their right to seek disqualification. We now address that issue.

---

*Gulf Oil Corp.*, 588 F.2d 221, 224 n.3 (7th Cir. 1978) (explaining that an inquiry into whether actual confidences were disclosed "should be avoided whenever a presumption can be utilized due to the unsatisfactory nature of the potential evidence," including "questionable reliance on *ex parte* representations made *in camera* by the party seeking disqualification as to communicated confidences").

[63] Our two-prong framework requiring both an instruction and other reasonable steps helps reduce the risk of disclosure to an acceptable level by addressing two types of nonlawyers. Generally speaking, the first prong is directed at ethical nonlawyers who will comply with instructions while the fact-intensive second prong is geared toward forgetful, inattentive, or even potentially rogue nonlawyers. *See supra* notes 37, 39, 48. However, an ethical nonlawyer may be forgetful or careless at times—such is the lot of human nature—and other reasonable steps provide guardrails to support an instruction. And even a rogue nonlawyer may be more likely to abide if admonished. Thus, both prongs are necessary, but neither is sufficient on its own to satisfy the test.

[64] *Am. Home Prods.*, 985 S.W.2d at 75.

20

## C.

When considering disqualification motions, "courts must adhere to an exacting standard . . . to discourage their use as a dilatory trial tactic."[65]  Consistent with this standard, a "[f]ailure to timely seek disqualification constitutes waiver."[66]  Waiver primarily concerns the movant's intention, as it requires an "intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right."[67]  A disputed fact issue on intention precludes mandamus relief, as "we may not make factual determinations in mandamus proceedings."[68]

The affidavits of plaintiff Shah and his counsel Meade attest that they first became aware of the conflict in January 2023, when Shah's representative recognized the legal assistant's name on an earlier e-filing notification.  The plaintiffs and their counsel also documented their diligence after that time.  Within a month, Meade researched the issue, notified Harrison of the conflict, and requested information from Hicks Thomas.  When Harrison responded, the plaintiffs promptly filed

---

[65] *RSR II*, 568 S.W.3d at 666 (quoting *Spears v. Fourth Ct. of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)).

[66] *Id.*  Following our precedent, the parties frame this equitable issue in terms of waiver.

[67] *Id.* (quoting *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008)).

[68] *RSR I*, 475 S.W.3d at 778.

a disqualification motion in early March.[69] We have held that around a two-month delay in filing a disqualification motion does not constitute waiver when there was evidence the movant acted diligently.[70] That is the case here.

The defendants do not focus on that two-month delay; instead, they dispute when the plaintiffs became aware of the conflict. Under the defendants' theory, the plaintiffs were on notice, as a matter of law, nearly a year earlier when the case documents with the e-filing notifications listing the legal assistant's name were filed in March 2022. If so, an unexplained one-year delay before filing the disqualification motion would be unquestionably dilatory. As the defendants would have it, their evidence of the date the e-filing notifications were sent conclusively overcomes Shah's and Meade's testimony.[71]

On this record, we cannot agree. The defendants' competing evidence fails to establish as a matter of law that the plaintiffs were aware of the conflict before January 2023. Notably, the March 2022 documents were served on Meade, not the legal assistant's former

---

[69] *See In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 52-53 (Tex. 1998) (orig. proceeding) (considering efforts to identify and resolve disqualification issues between the opposing parties as relevant to whether the delay was timely).

[70] *Am. Home Prods.*, 985 S.W.2d at 73 (collecting cases, noting the movant's diligence, and holding that "the delay in filing the motion to disqualify, which was less than two months, as a matter of law did not constitute a waiver under the facts of this case").

[71] The defendants raise this point only as a question of law. In this Court, they have not identified a disputed fact question on this issue nor argued that the trial court abused its discretion in granting the disqualification motion on submission rather than conducting an oral evidentiary hearing.

employer Munsch Hardt, which had not been involved in the case since 2013. And even if Meade had noticed the name or had constructive notice of it, his awareness of the conflict does not necessarily follow without two significant and unsupported inferential leaps. Meade first would have had to recognize the name as being the same as Munsch Hardt's former legal assistant when the only record evidence of his interactions with her was that they both attended some joint strategy meetings from 2009 to 2011. Then, Meade would have had to recall that she had worked on the same matter *over a decade ago* for Munsch Hardt as Wahrlich's legal assistant.[72] These unsubstantiated inferences do not conclusively overcome Shah's and Meade's testimony that they first became aware of the conflict in January 2023.

We therefore hold that the trial court did not abuse its discretion in concluding that the plaintiffs timely sought disqualification.

### III. Conclusion

Disqualification is a harsh remedy, but the burden of employing preventative measures to avoid this result is slight. A firm must admonish and take other reasonable measures to effectively screen a side-switching nonlawyer from a conflicted matter. In this context, a bright-line rule provides clear guidance to the bar and comfort to clients that their confidences will be protected—a primary duty embedded in

---

[72] Meade testified to that effect in a subsequently filed declaration, explaining that he "did not immediately recall [the legal assistant]'s full name" until he was "reminded" of it in January 2023, "after which [he] recalled her role at Munsch Hardt and her involvement in [their] meetings and discussions of dispute strategy." This testimony, however, is not necessary to our disposition, and we do not rely on it here because the declaration had not been filed when the trial court originally granted the disqualification motion.

23

all facets of our legal system. Because the side-switching legal assistant received no prior instruction and the plaintiffs were not, as a matter of law, untimely in seeking disqualification, the trial court properly exercised its discretion in granting the motion to disqualify. We therefore deny the petition for writ of mandamus.

John P. Devine
Justice

**OPINION DELIVERED:** April 10, 2026

24